**No. 20-55401**

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

MARCUS GRAY (PKA Flame), et al.,

*Plaintiffs-Appellants*,

v.

KATHERYN ELIZABETH HUDSON (PKA Katy Perry), et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 2:15-cv-05642
Hon. Christina A. Snyder

---

### APPELLANTS' OPENING BRIEF

---

Michael A. Kahn
kahn@capessokol.com
Capes Sokol
8182 Maryland Ave., 15th Floor
Clayton, MO 63105
Tel: 314-505-5406

Attorney for Plaintiffs-Appellants

**TABLE OF CONTENTS**

INTRODUCTION............................................................. 1

STATEMENT OF JURISDICTION.......................................... 6

STATEMENT OF ISSUES ON APPEAL.................................. 7

STATEMENT OF THE CASE............................................... 8

    1. The Ostinatos......................................................... 8
    2. Creation of "Dark Horse"......................................... 9
    3. The Liability Phase................................................. 13
    4. The Damages Phase................................................ 16
    5. The Post-Trial Evidentiary Submission by the Amici.... 18
    6. Prejudgment Interest.............................................. 19

ARGUMENT................................................................. 20

    I.    The District Court erred in reversing the properly
             instructed jury's verdict, which was firmly rooted
             in the evidence of "extrinsic" similarity adduced
             at trial................................................................ 20

        A.    Introduction.............................................. 20

        B.    Standard of Review..................................... 21

                i.  General standard governing review of
                    Rule 50(a) rulings.................................. 21

                ii. Additional standard governing review
                    of Rule 50(a) rulings concerning
                    application of the "extrinsic"
                    substantial similarity test...................... 23

                iii.The meaning of "original expression"
                    in the realm of copyright protection........ 25

C. Ample evidence supported the jury's finding that "Joyful Noise" and "Dark Horse" were substantially similar...................................... 28

    i. The trial evidence demonstrated that the pitch sequence from the "Joyful Noise" ostinato, even viewed alone, easily meets the originality threshold as a creative and distinctive melody........ 28

    ii. The district court relied upon an erroneous statement of law in ignoring Dr. Decker's testimony regarding the originality of the pitch sequence, thus undercutting the basis of its ruling......... 32

    iii. In ruling that the "Joyful Noise" ostinato was not original, the district court ignored key testimony by Dr. Decker on the originality issue while cherry-picking snippets of Dr. Ferrara's testimony that the jury found unpersuasive.............................. 35

    iv. Dr. Decker identified several other elements which, in combination with the pitch sequence, formed the distinctive ostinato in "Joyful Noise" that should be entitled to protection under the low standard for originality established by the Supreme Court in *Feist*................................................ 39

    v. A jury following the District Court's jury instructions could reasonably find substantial similarity between "Joyful Noise" and "Dark Horse" based on the foregoing elements................................ 43

ii

D. The district court erred by attempting to apply a "thin copyright" standard to the same evidence regarding plaintiff's musical composition that the jury presumably determined was entitled to more than "thin" protection.............................................. 48

E. The District Court erred by relying upon evidence outside the trial record to justify reversal of the jury's verdict........................... 51

II. The district court's "new trial" hypothetical ruling on damages conflicts with its affirmation of the jury's damages calculation........................... 53

III. Plaintiffs' request for an award of prejudgment interest on that portion of the profits earned by defendants nearly five years before entry of the judgment was fair and just; accordingly, the district court's denial of that request was an abuse of discretion............................................... 57

CONCLUSION................................................................. 61

CERTIFICATE OF COMPLIANCE.......................................... 63

CERTIFICATE OF SERVICE................................................. 64

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barnard v. Theobald,*
  721 F.3d 1069 (9th Cir. 2013) ................................................ 57

*Baxter v. MCA, Inc.,*
  812 F.2d 421 (9th Cir. 1987) .................................................. 27

*Brown Bag Software v. Symantec Corp.,*
  960 F.2d 1472 (9th Cir. 1992) ................................................ 44

*Dezendorf v. Twentieth Century-Fox Film Corp.,*
  99 F.2d 850 (9th Cir. 1938) .................................................... 23

*Dunlap v. Liberty Nat. Prod., Inc.,*
  878 F.3d 794 (9th Cir. 2017) ............................................ 21, 22

*Escriba v. Foster Poultry Farms, Inc.,*
  743 F.3d 1232 (9th Cir. 2014) ................................................ 22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,*
  499 U.S. 340 (1991) ........................................25, 26, 32, 38, 50

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,*
  886 F.2d 1545 (9th Cir. 1989) .............................. 58, 59, 60, 61

*Harper House, Inc. v. Thomas Nelson, Inc.,*
  889 F.2d 197 (9th Cir. 1989) .................................................. 50

*Ingram v. ACandS, Inc.,*
  977 F.2d 1332 (9th Cir. 1992) ................................................ 22

*Leonard v. Stemtech Int'l Inc,*
  834 F.3d 376 (3d Cir. 2016) .................................................. 60

*Polar Bear Prods., Inc. v. Timex Corp.,*
  384 F.3d 700 (9th Cir. 2004) .................................................. 59

*Price v. Stevedoring Servs. of Am., Inc.,*
   697 F.3d 820 (9th Cir. 2012) .................................................. 61

*Reeves v. Sanderson Plumbing Prod., Inc.,*
   530 U.S. 133 (2000) ............................................................... 22

*S.E.C. v. Todd,*
   642 F.3d 1207 (9th Cir. 2011) ................................................ 54

*Satava v. Lowry,*
   323 F.3d 805 (9th Cir. 2003) ............................................ 26, 50

*Skidmore v. Zeppelin,*
   952 F.3d 1051 (9th Cir. 2020) .................... 23, 24, 25, 32, 43, 49

*Swirsky v. Carey,*
   376 F.3d 841 (9th Cir. 2004) ........... 24, 25, 26, 27, 38, 42, 44, 46

*Three Boys Music Corp. v. Bolton,*
   212 F.3d 477 (9th Cir. 2000) .......................... 23, 24, 26, 42, 43

*Williams v. Gaye,*
   895 F.3d 1106 (9th Cir. 2018) ............................ 23, 24, 26, 42

## Statutes and Rules

Fed.R.Civ.P. Rule 50(a) ......................................................... 21, 22

Fed.R.Civ.P. Rule 50(b) ............... 2, 6, 13, 20, 21, 24, 51, 52, 53, 54

28 U.S.C. § 1291 ........................................................................ 7

28 U.S.C. § 1338(a) .................................................................. 6

## Other Authorities

*Brittanica Online Encyclopedia,*
   https://www.britannica.com/art/ostinato ............................... 1

*Easy Guitar Tab,* Guitar Control,
   https://guitar.com/beginner/easy-guitar-tab (last
   visited 10/9/20) ...................................................................... 33

Wikipedia,
https://en.wikipedia.org/wiki/Symphony_No._5_(Bee-
thoven .................................................................. 33, 37

## INTRODUCTION

Plaintiffs are three Christian gospel hip-hop artists whose religious song "Joyful Noise" was released on their Grammy-nominated album *Our World Redeemed* in 2008. Five years later, defendants created the song "Dark Horse" in the summer of 2013, released it as part of a promotion in August of that year, and included it on the Katy Perry *Prism* album released later that fall.

At issue in this copyright lawsuit is a melodic phrase that plays throughout plaintiffs' song and nearly half of defendants' song. The musical term for that phrase is "ostinato," which the *Encyclopedia Britannica* defines as a "short melodic phrase repeated throughout a composition, sometimes slightly varied or transposed to a different pitch."[1]

## Substantial Similarity—Extrinsic Test

This appeal presents a narrow but dispositive question: did the district court err in reversing the unanimous verdict of a properly instructed jury on the issue of substantial similarity? And more specifically, did the district court err in basing that reversal

---

[1] "ostinato" *Brittanica Online Encyclopedia,* https://www.britannica.com/art/ostinato

*solely* upon the jury's determination that the allegedly infringing portion of defendants' song satisfied the "extrinsic test" for substantial similarity?

In their Fed.R.Civ.P. 50(b) motion, defendants challenged the jury's findings on every element of the copyright claim, each of which was the subject of a special verdict question drafted by the defendants. As discussed below, the district court determined that there was sufficient evidence to support the jury's findings on all but one of those answers. Indeed, the district court rejected the defendants' challenge to the jury's determination of substantial similarity under the "intrinsic" standard, ruling that "a reasonable jury could nevertheless conclude that the 'concept and feel' of the two ostinatos in this case are 'intrinsically' similar." (CR 527, ER 24-25)[2]

Thus, this appeal hinges upon the district court's reversal of the properly instructed jury's determination that the two ostinatos in this case are not merely "intrinsically" similar but also "extrinsically" similar. As explained below, the district court reached

---

[2] "CR" and "ER" are the abbreviations for "Clerk's Record" and "Excerpts of Record."

that ruling through its recitation of isolated snippets of the testimony by the two musicologist expert witnesses, Dr. Todd Decker (for plaintiffs) and Dr. Lawrence Ferrara (for defendants) while:

- ignoring key portions of Dr. Decker's testimony,

- basing its ruling on the fundamentally erroneous belief that pitch sequence (i.e., a melody) "is not entitled to copyright protection" (*id.* at 13),

- improperly relying on the purported results of an unverified post-trial "experiment" presented as evidence in an amicus brief; and

- applying an incorrect legal standard for "originality."

Significantly, the same two experts and their same two opinions were the focus of the district court's denial of summary judgment on the same issue of "extrinsic" similarity. (CR 299, ER 528-540) In ruling on that motion, the district court examined the same evidence and concluded: "The Court finds that Decker's expert testimony is sufficient to raise a genuine issue of material fact as to substantial similarity." (CR 299, ER 538) In so doing, the district court evaluated defendants' various attacks on Dr. Decker's

3

testimony—largely the same ones defendants resurrected in their post-trial motion—and concluded that "the Court cannot determine as a matter of law the overlapping similarities identified by Decker are not protectible musical expressions." (*Id.*, ER 539-540)

So, what changed the district court's mind?

One factor was the post-trial submission of an amicus brief by a group of musicologists, which the district court identified as one of the submissions it considered in ruling on the motion.[3] As more fully explained in the Statement of the Case, on the key "extrinsic" issue of pitch sequence (melody), the amici presented the purported results of their "input[ing] CCCCBB" into something called the "Themefinder.org database" and then again into some French database called the Repertoire International des Sources Musicales. (CR 514, ER 340-341) This offering of an unverified description of the opaque results of an experiment performed by these third parties *after* the trial is not merely improper and inadmissible but

---

[3] The district court explained that, in addition to the post-trial submissions by the parties, "a group of musicologists submitted an amicus brief in support of defendants' motion for renewed judgment as a matter of law, or in the alternative a new trial on January 9, 2020. See ECF No. 514 ('Am.Br.')." (CR 527, ER 2)

4

obviously of no possible evidentiary relevance to the jury's determination.

Or so we thought.

But on the dispositive issue of the "extrinsic" similarity between the two ostinato melodies, and specifically between the two pitch sequences—the very issue on which the district court previously denied summary judgment—the district court quoted from those purported results in that amicus brief as evidence in support of its conclusion reversing the jury's finding of substantial similarity under the "extrinsic" test. (CR 527, ER 21)

That the amici would inject unsubstantiated factual assertions into a post-trial amicus brief is improper, but that the district court would rely upon this post-trial hearsay in vacating the jury verdict—in addition to its mistaken belief that a pitch sequence "is not entitled to copyright protection"—are more than adequate grounds for this Court to reverse that order and reinstate the jury verdict. Other errors, however, abound, as more fully described below, any one of which is sufficient to reverse the district court and reinstate the jury's verdict.

**Prejudgment Interest**

The other principal issue before this Court is the denial of plaintiffs' motion for an award of prejudgment interest. Defendants' mega-hit song was released in the Fall of 2013. The jury verdict was entered almost six years later. Plaintiffs had requested an award of 45% of the defendants' profits—because the infringing melody plays through 45% of the song; however, the jury awarded half that amount: 22.5%. As the record below establishes, these defendants had already pocketed close to, or even more than, 50% of their total profits by the end of 2014—nearly five years before entry of judgment on the jury verdict. Thus, plaintiffs' request for an award of prejudgment interest on just 22.5% of the millions of dollars in wrongful profits is, by any measure, fair and just, and its denial is an abuse of discretion.

## STATEMENT OF JURISDICTION

Plaintiffs filed this lawsuit for copyright infringement in federal district court in accordance with 28 U.S.C. § 1338(a) The district court entered judgment on the jury verdict on September 11, 2019. (CR 473, ER 367-368) On March 16, 2020, the district court issued its judgment granting defendants' Rule 50(b) motion for judgment

6

notwithstanding the jury verdict and denying as moot defendants' motion for a new trial and plaintiffs' motion for prejudgment interest. (CR 527, ER 1-32) The Clerk of the District Court entered that judgment on the following day. Twenty-seven days later, plaintiffs filed their Notice of Appeal. (CR 533, ER 330-332) Thus this Court has jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES ON APPEAL

1. Whether the district court's reversal of a properly instructed jury's verdict on the question of the "extrinsic" similarity of the two songs was erroneous when, as required by this Court, the evidence is viewed in the light most favorable to the plaintiffs?

2. Whether the district court abused its discretion in its provisional grant of a new trial on damages despite its express finding that the jury's special verdict on those damages "was based on substantial evidence, and not contrary to law."

3. Whether the district court abused its discretion in denying plaintiffs' motion for prejudgment interest on that portion of the wrongful profits defendants had already earned nearly five years before entry of judgment on the jury verdict.

7

## STATEMENT OF THE CASE

### 1.    The Ostinatos

As the district court explained, "[t]his copyright infringement action concerns the allegation that an 8-note ostinato from defendants' song 'Dark Horse' infringes upon plaintiffs' copyright in the musical composition of the 8-note ostinato in their song 'Joyful Noise.'" (CR 527, ER 1)

An "ostinato" is a repeating musical figure, which has both a melodic and structural component. (CR 542, ER 218:15-22) Plaintiffs' musicology expert Dr. Todd Decker likened an ostinato to a repeating section of train track, placed in succession, upon which the rest of a song is built. (*Id.*)[4]

As this Court can confirm from the recordings of the two songs, the ostinato in "Joyful Noise" opens the song, repeats

---

[4] Dr. Decker is a tenured professor of music and the chair of the Music Department at Washington University in St. Louis. He has a Ph.D. in Historical Musicology with a special focus on "music borrowing." He has published four scholarly books and various peer-reviewed articles on the topic of popular music, including one on hip hop. (CR 542, ER 202:15- 211:5) Among the courses he teaches is "Popular Music in American Culture," which "looks at the history of recorded music from 1920 to yesterday basically." (*Id.*, ER 211:11-25)

throughout the song, and serves as the melodic musical bed for the song's verses. (Trial Exh. 75) The infringing ostinato in "Dark Horse" is first heard at about the 18-second point in the song, repeats throughout approximately 45% of the song, and serves as the melodic musical bed for the song's verses. (Trial Exh. 76)[5]

In other words, as explained below, the similarities identified by Dr. Decker are not limited to an isolated eight-note section of each song; instead, those similarities comprise large swaths of both compositions.

## 2. Creation of "Dark Horse"

The individual defendants created the "Dark Horse" song in the summer of 2013. (CR 541, ER 328:15-329:22) As defendant Katheryn Hudson (p/k/a Katy Perry) testified, she met with defendants Lukasz Gottwald and Henry Russell Walter at a recording studio where the men played numerous short instrumental melodies that they had created for her to choose from.

---

[5] The ostinato is heard for a total of 95 seconds throughout "Dark Horse" (CR 542, ER 243:24-244:6), which is 215 seconds long, and thus, as the district court explained, evidence in the record "established that the infringing ostinato in 'Dark Horse' plays across 45% of the composition." (CR 527, ER 29)

The melodies she chose would serve as the instrumental beds of the songs for her next album. As Ms. Perry testified, Gottwald and Walter played "little beds of music for me to listen to. Not too long. Just kind of appetizer size, and then they'll do full entrees if I like them." (CR 541, ER 313:13-19, 317:3-24) As for the size of these instrumental "beds" of music, she testified they were "anything from a drumbeat to, you know, eight bars of music." (CR 541, ER 318:10-13)

One of those "beds" featured the two-bar ostinato that became the instrumental bed for 45% of "Dark Horse." (*Id.*, ER 318:14-319:22; Exh. 74) As Ms. Perry testified, she had a strong positive response to that instrumental, immediately selecting it for her next album:

> And so I heard the sound and I actually called one of my friends [defendant Sarah Hudson] who was in Los Angeles and we were in Santa Barbara which is where I go to make most of my music. * * * [W]e had never written together before, but I knew she was an up and coming song writer. And I said you've got to get here. I think that you would love this sound, and I have this idea or metaphor about what the song should be

10

(CR 541, ER 323:16-325:9)[6] Defendant Sarah Hudson drove up to the studio the following day and, with the other individual Defendants (except for Jordan Houston), they created and recorded "Dark Horse." (CR 541, ER 327:9-13, 328:5-329:22)

The song was officially released in October 2013 on Katy Perry's *Prism* album as one of 13 tracks on the original album and one of 16 tracks on the deluxe album. (CR 541, ER 315:15-316:1; Exh. 56) However, "Dark Horse" itself was actually first released in August as part of a Pepsi/MTV contest between "Dark Horse" and another song, "Walking on Air," to be included in the *Prism* album (CR 549, ER 59:2-17). It was then released in advance of the album on September 17th as a promotional single, which, Ms. Perry explained, served as a "teaser" to generate excitement for the album. (CR 541, ER 316:2-20)

"Dark Horse" was a huge hit, became one of just five music videos from the *Prism* album, and was performed by Ms. Perry live

---

[6] Defendants produced a much longer version of the instrumental bed than the short portion originally played for Ms. Perry. (Trial Exh. 74) As the Court can confirm from Ms. Perry's testimony, she was only played the first portion of that instrumental up through the initial ostinato.

at the Super Bowl XLIX Halftime Show in 2015. (CR 541, ER 319:12-22, 322:5-7) The ostinato played a key role in that Super Bowl performance, which was watched by approximately 150 million viewers worldwide.[7] In that performance, the introductory 18 seconds of the song were omitted; instead, the Super Bowl version of the song opened with the ostinato at issue in this case. When asked why she and her musical director decided to open with that ostinato, which she labeled "the chorus," Ms. Perry explained that "the chorus is the most identifiable part of the song I'd imagine." (CR 541, ER 322:12-22) When examined by her own counsel, Ms. Perry confirmed the importance of the ostinato (CR 541, ER 326:10-4):

> Q. And is it fair to say that in the editing process that affected all these songs [for the Super Bowl performance], you and your team decided it was more important to have the chorus of Dark Horse than the 12 (sic), few second introduction of the song?
>
> A. Correct.[8]

---

[7]CR 549, ER 62:4-10

[8]As discussed below, defendant's musicologist labeled that introductory arpeggio "Ostinato 1" and labeled the ostinato at issue "Ostinato 2." However, Ms. Perry, the songwriter and performer of the song, named that opening arpeggio the "introduction."

12

### 3.    The Liability Phase

At the conclusion of the liability phase of the lawsuit, the district court instructed the jury on the elements of a claim of copyright infringement and presented them with a special verdict form prepared by the defendants. The form required the jury to provide a unanimous answer to each of eight separate questions. (CR 456, ER 376-385) In order to reach a final verdict of copyright infringement, the jury needed to answer "Yes" to six of those question—Nos. 1, 2, 3, 4, 7, and 8—and "No" to Questions 5 and 6. That is what the jury did.

In their post-trial Rule 50(b) motion, defendants challenged most of those answers. However, except for the jury's answer to Question 2 (the "extrinsic" similarity question), the district court found that the sufficient evidence supported each answer. For example, the Defendants' challenged the jury's affirmative answer to Question 4, which asked whether "Joyful Noise" was "widely disseminated such that Defendants had a reasonable opportunity to hear 'Joyful Noise' prior to creating 'Dark Horse.'" The district court rejected defendants' challenge to that answer, explaining:

> Plaintiffs presented evidence at trial that "Joyful Noise" was played more than 6 million times on YouTube and MySpace, that "Joyful Noise" was nominated for a Grammy, that "Joyful Noise" was performed at hundreds of concerts across the country, and that "Joyful Noise" ranked highly on the Billboard charts for popular music.

(CR 527, ER 25) Thus the district court determined: "A reasonable jury could have concluded from this evidence that the relevant defendants who composed the allegedly infringing ostinato in 'Dark Horse' had a reasonable opportunity to have encountered 'Joyful Noise.'" (*Id.*, ER 25)

Similarly, defendants challenged the jury's rejection of their testimony that they independently created "Dark Horse."[9] But, as the district court explained, the jury determined "that [defendants'] testimony was not credible, or at least not so credible as to establish 'proof of independent creation.'" (*Id.*, ER 26) As such, the district court held that it must "yield to that determination." (*Id.*, ER 26-27)

---

[9] "**Question 6:** Did Defendants prove, by a preponderance of the evidence, that Defendants independently created 'Dark Horse'? Yes ____ No __√__ " (CR 456, ER 382)

Accordingly, the focus of the district court's ruling, and thus this Court's review, is the jury's affirmative answer to Question 2: "Did Plaintiffs prove, by a preponderance of the evidence, that the 'Joyful Noise' and 'Dark Horse' musical compositions are objectively substantially similar in copyrightable protectable expression?" (CR 456, ER 378)

The jury's answer was based on their evaluation of the testimony of the two expert musicologists. To avoid duplication, that testimony will be discussed in detail in the Argument section of the brief. For now, it is sufficient to list what Dr. Decker identified in his testimony, and the district court addressed in its post-trial ruling, as the eight substantially similar original elements of the two 8-note ostinatos (CR 527, ER 10):

1. an original melody built in the minor mode;
2. a melodic phrase length of eight notes;
3. a pitch sequence, or melody, beginning with the scale intervals "3 3 3 3 2 2" and a similar resolution to both melodies;
4. a rhythm of eighth notes;
5. a square and even rhythm without syncopation;
6. the structural use of the phrase as an ostinato (and as the musical bed for the verse sections of both songs);

15

7. the tambor of the melodies' instrumentation; and

8. the notably empty and isolated texture of both compositions.

### 4. The Damages Phase

After the jury returned its verdict finding that the defendants had infringed plaintiffs' copyright in "Joyful Noise," the trial resumed on the issue of damages. Plaintiffs sought an award of 45% of the profits each defendant earned on "Dark Horse." As the district court explained (CR 527, ER 29):

> Evidence in the record . . . established that the infringing ostinato in "Dark Horse" plays across 45% of the composition. See Trial Tr. at 465:1. Based on that testimony, plaintiffs requested 45% of defendants' aggregated profits, whatever the jury determined that amount to be.

But, as the district court explained, "[t]he jury evidently decided to divide plaintiffs' requested amount in half—either as a result of defendants' evidence, or some other reason—and award damages in the amount of 22.5% of total profits." (CR 527, ER 30) Either way, as the district court held, [t]he jury's decision was based on substantial evidence, and not contrary to law." (*Id.*, ER 30)

16

In quantifying that 22.5% calculation, the jury was provided, in the special verdict form, with the parties' stipulation as to the gross revenues and costs for each of the defendants except for Capitol Records. (CR 467, ER 371)

As for Capitol Records, plaintiffs did not dispute its representation of $12.4 million in total net revenues from "Dark Horse." However, as the district court explained, plaintiffs did dispute $5,102,213 of Capitol Records' purported $11,772,912 in expenses. Capitol Records had claimed the disputed expense as "overhead costs," and as the district court explained in denying Capitol Records' post-trial challenge to the jury's rejection of those purported overhead costs:

> At trial, plaintiffs sought to discredit the appropriateness of this overhead figure through cross-examination, suggesting that the figure contained fixed expenses that did not "contribute" to the production, marketing, or commercial success of "Dark Horse." See Trial Tr. at 1431:15-1435:11. Weighing this evidence, the jury appears to have rejected defendants' request by instead only deducting $6,669,699 of the $11,772,912 in claimed expenses from the total claimed profits, and declining to deduct the $5,103,213. See Damages Verdict at Question 2.

Accordingly, as the district court held, "[t]he jury's decision to reject the deduction of $5,103,213 in claimed overhead

17

costs was supported by substantial evidence adduced at trial, see Trial Tr. at 1431:15-1435:11, and not otherwise contrary to law. For this reason, had the Court reached the issue of Capitol Records' overhead, defendants would not have been entitled to judgment as a matter of law."[10]

### 5. The Post-Trial Evidentiary Submission by the Amici

Over plaintiffs' objections, the district court granted the motion of 15 musicologists for leave to file an amicus brief in support of the defendants' post-trial motion for judgment as a matter of law. (CR 513, ER 347) As plaintiffs pointed out in their opposition to that motion (CR 511, ER 356), the *amici* were improperly attempting to support their argument with extra-judicial hearsay evidence.

Specifically, on the key "extrinsic" issue of pitch sequence, the amici urged the district court to "[overturn] the errant jury verdict" for the following reason:

> Amici Musicologists inputted CCCCBB into the
> Themefinder.org database and there were 6 if one stays
> in the same key; 26 in transposed versions that preserve
> the shape/sequence. See Themefinder.org, Center for

---

[10] The district court's two citations to "Trial Tr. at 1431:15-1435:11" can be found at CR 549, ER 36:15-40:11.

Computer Assisted Research in the Humanities at Stanford University. Further, Amici Musicologists inputted CCCCBB into the RISM database and there were more than two thousand (2000) matches in all keys with the bulk coming from 18th and 19th century works. See Repertoire International des Sources Musicales (RISM), rism.info.

(CR 514; footnotes omitted, ER 340-341)

In ruling on the issue of "extrinsic" similarity, the District Court stated the following in support of that ruling (CR 527, ER 21):

See also Am. Br. at 8 (explaining that a search of music databases housed by the Center for Computer Assisted Research in the Humanities at Stanford University, and the Repertoire International des Sources Musicales, indicates that there are at least 6 other compositions in the same key containing the same pitch sequence, and more than 2,000 in all keys)

### 6. Prejudgment Interest

Upon entry of the judgment based on the jury verdict awarding plaintiffs 22.5% of each of the defendants' profits from "Dark Horse," plaintiffs filed a timely motion for an award of prejudgment interest based on, among other things, the five-year lag between the filing of the lawsuit in the summer of 2014 and the entry of the jury verdict in September of 2019. (CR 488, ER 358-366) A separate declaration by the undersigned (including as attachments the stipulated joint trial exhibits summarizing each of the defendants'

19

annual statements of revenues and costs for "Dark Horse") showed

that by the end of 2014 all of the individual defendants had earned

far more than 22.5% of their total profits; indeed, Capitol Records

had earned more than 70% of its total revenues. (CR 510, including

exhibits, ER 618-647)

## ARGUMENT

I.   **The District Court erred in reversing the properly instructed jury's verdict, which was firmly rooted in the evidence of "extrinsic" similarity adduced at trial.**

### A. Introduction.

The jury made an express finding that "Dark Horse" was

substantially similar to Plaintiff's song under the "extrinsic" test. In

reaching that conclusion, the jury was properly instructed on Ninth

Circuit law regarding both the "intrinsic" and "extrinsic" substantial

similarity tests.[11]

The District Court reversed the jury's verdict on the sole

ground that the jury had no reasonable basis to conclude that the

two works were "substantially similar" under the "extrinsic" test. In

---

[11] As discussed below in § I(D), the district court improperly gave the jury a "thin copyright" instruction. However, that instruction did not compel the jury to apply it, and the jury presumably determined that the ostinato did not fit within the parameters of a thin copyright.

doing so, however, the District Court failed to follow the legal standard applicable to motions under Rule 50(b) and did not give appropriate deference to the jury's verdict, including the extensive evidence of "extrinsic" similarity. Specifically, the District Court (1) failed to construe the trial evidence in a light most favorable to the plaintiffs, (2) misunderstood the musical term "pitch sequence," which it erroneously states "is not entitled to copyright protection," (3) relied on inadmissible post-trial third-party factual contentions to discount favorable testimony of Plaintiff's expert musicologist, and (4) demanded a higher standard of proof (virtually identical) than required under the law (substantial similarity). We address each of these material errors below.

### B. Standard of Review

#### i. General standard governing review of Rule 50(a) rulings.

The Ninth Circuit reviews *de novo* a district court's grant of a Rule 50(b) renewed motion for judgment as a matter of law. *See Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017). The grant of such a motion is inappropriate unless the evidence, construed in the light most favorable to the non-moving party,

21

permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *Id.*

As the Supreme Court instructs, the reviewing court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

This Court emphasized in *Dunlap*, quoting *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1232, 1242 (9th Cir. 2014), that a jury's verdict "must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *See also Ingram v. ACandS, Inc.*, 977 F.2d 1332, 1340 (9th Cir. 1992) ("When there is sufficient evidence before the jury on a particular issue, and the instructions of law on the issue are correct, the jury's verdict will not be disturbed."). Such is the case here.

22

### ii. Additional standard governing review of Rule 50(a) rulings concerning application of the "extrinsic" substantial similarity test.

These restrictive standards of review apply *a fortiori* to music copyright cases. As this Court stated in affirming the jury verdict in *Williams v. Gaye,* 895 F.3d 1106, 1127 (9th Cir. 2018) (quoting *Three Boys Music,* 212 F.3d 477, 481 (9th Cir. 2000), "[w]e are 'reluctant to reverse jury verdicts in music cases' on appeal, '[g]iven the difficulty of proving . . . substantial similarity.'" Likewise, the *Williams* court reiterated, "[o]ur conclusion in *Three Boys Music* provides an example of the deference we must apply in reviewing the jury's verdict. Although that case presented 'a weak case of access and a circumstantial case of substantial similarity,' we held that 'neither issue warrants reversal of the jury's verdict.'" *Id.* at 1127 n. 16, overruled on other grounds while affirming the jury verdict on substantial similarity at issue in *Skidmore v. Zeppelin,* 952 F.3d 1051, 1069 (9th Cir. 2020). Indeed, as Judge Ikuta emphasized, concurring in part and dissenting in part in *Skidmore, supra,* at 1085, "as an appellate body, we are foreclosed from determining whether an identified combination of musical elements is original. We are not well situated to determine whether

23

a musical passage is original," stating that such findings should be left to properly instructed juries (citing *Dezendorf v. Twentieth Century-Fox Film Corp.,* 99 F.2d 850, 851 (9th Cir. 1938)). *Skidmore*—like the Court in *Williams*—affirmed the jury verdict on the issue of substantial similarity.

To determine whether two music works are substantially similar, the Ninth Circuit employs a two-part analysis consisting of an objective extrinsic test and a subjective intrinsic test. *Swirsky v. Carey,* 376 F.3d 841, 845 (9th Cir. 2004). As the district court acknowledged, because "the subjective question whether works are intrinsically similar must be left to the jury," only the extrinsic test need be considered for purposes of a Rule 50(b) motion. (CR 527, ER 24, quoting *Swirsky, supra*).

The extrinsic test "requires that the plaintiff identify concrete elements based on objective criteria" and "often requires analytical dissection of a work and expert testimony." *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 485 (9th Cir. 2000); *Swirsky, supra,* 376 F.3d at 845.

This Court has never announced a uniform set of factors for analyzing a musical composition under the extrinsic test, explaining

24

that "music is comprised of a large array of elements, some combination of which is protectable by copyright." *Id.* at 849. Thus, the initial query is whether any elements of the ostinato in "Joyful Noise" are individually protected, and if not, whether the unprotectable elements that comprise the ostinato, taken in combination, may be entitled to copyright protection under the Ninth Circuit's broad and loose standard for music. *Id.* at 848. After this initial query, the jury may compare protectable elements in "Joyful Noise" against the Defendants' work for proof of copying as measured by substantial similarity.

### iii. The meaning of "original expression" in the realm of copyright protection.

Before we address the errors in the district court's ruling, it's important to set the legal context for what constitutes the level of "original expression" needed for copyright protection, especially in music. As this Court recently reiterated, citing to the Supreme Court's holding on the required level of originality for copyright protection, "[i]t is not difficult to meet the famously low bar for originality" and the requirement is a "low threshold." *Skidmore*, 952

25

F.3d at 1069 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991)).

As the Supreme Court explained, "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist*, 499 U.S. at 345. This Court emphasized in *Swirsky*, 376 F.3d at 851, that "[i]n this circuit, the definition of originality is broad, and originality means little more than a prohibition of actual copying [of a prior work]." *See also Three Boys Music*, 212 F.3d at 489 (holding that originality requires only "something more than a merely trivial variation").

Though a truly commonplace musical element, standing alone, cannot be considered "original" for purposes of copyright protection, a combination of unprotectable elements is nevertheless protectable if the elements "are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003). "There is no one magical combination" of elements that permit a finding of originality. *Williams v. Gaye*, 895 F.3d 1106, 1120 (9th Cir. 2018) (quoting *Swirsky*, 376 F.3d at 849). Music "is

26

not capable of ready classification into only five or six constituent elements'" and "is instead 'comprised of a large array of elements, some combination of which is protectable . . .." *Id.* Indeed, as this Court has held in numerous appeals, a wide range of musical elements, individually or in combination, may enjoy protection as original works, including pitch sequences of just 6 or 7 notes. *See, e.g., Swirsky,* 376 F.3d at 852 ("[i]t cannot be said as a matter of law that seven notes is too short a length to garner copyright protection"); *Baxter v. MCA, Inc.,* 812 F.2d 421, 425 (9th Cir. 1987) (noting that a sequence of just six notes could be protectable).

Given the low bar for originality, and the deference accorded to a jury's findings, the properly instructed jury's finding that the elements in the "Joyful Noise" ostinato met the threshold for copyright protection should not have been disturbed.

27

**C. Ample evidence supported the jury's finding that "Joyful Noise" and "Dark Horse" were substantially similar.**

    **i. The trial evidence demonstrated that the pitch sequence from the "Joyful Noise" ostinato, even viewed alone, easily meets the originality threshold as a creative and distinctive melody.**

Contrary to the district court's assertion that "Dr. Decker did not provide testimony that each of the elements he identified are individually original" (CR 527, ER 11), Dr. Decker testified at length that the pitch sequence, or melody, in the "Joyful Noise" ostinato was the product of creative choice, distinctive in the world of melodies, and not merely a copy of a scale or other musical building block. Specifically, Dr. Decker testified:

- The "Joyful Noise" ostinato includes a pitch sequence, or melody, of eight pitches within the minor scale which he described at trial as consisting of the scale intervals "3 3 3 3 2 2 2" followed by an alternating ending for the final pitch— the ostinato figure terminates on the eighth note by either leaping down to scale interval "6" or stepping down to scale interval "1" then rebounding back to scale interval "3" to restart the sequence of notes. This sequence of notes, which repeats over and over, forms the melody at the heart of the "Joyful Noise" ostinato. (CR 542, ER 215:10-225:9)

28

- This melody was created by employing a compositional technique in the minor mode where certain notes are repeated to build tension for the listener, which the melody then releases by descending to the next scale interval. (CR 542, ER 228:17-230:15)

- A key feature of the melody was that the eight notes continue repeating over and over. "Context is important, so this is extremely significant. It's the ostinato identity that's at issue here." (CR 542, ER 307:9-308:7) Thus, the melody in "Joyful Noise" is more than an isolated set of eight notes, because the eight-note melody repeats over and over—yet another creative choice.

- The descending contour of the melody (pitch sequence) is "noteworthy" and "significant." Dr. Decker, a music professor and an historian of popular American music, testified to the jury: "I have not seen another, a third piece that descends in the way these two ["Joyful Noise" and "Dark Horse"] do." (CR 542, ER 225:14-227:2)

- That both ostinatos "insistently sit on the lowered third degree...3 3 3 3...That's completely identical in both ostinatos...And then at exactly the same moment, both ostinatos step down to 2...[I]t's significant that...after four iterations of three...both of these ostinatos step down to two at exactly the same spot. At the fifth note which is the strongest note rhythmically in this ostinato, 1 and 5 are the strong and rhythmic points of arrival here." (*Id.*, ER 229:11-

231:5) As he explained, that fifth note of the eight notes is the "most significant": "it is that gesture where we repeat third scale degree three times building up tension that wants to be released and it's released to two on a particularly strong beat." (*Id.)*

- The similarity does not end with the first six notes. "Joyful Noise has two...alternating endings to its ostinato...dropping to 1 and dropping to 6 . . . Dark Horse uses both of the options offered in Joyful Noise. Joyful Noise models two ways to end this ostinato and Dark Horse uses both in every repetition . . . T]he two ostinatos...might end differently in terms of the actual rhythm of the [final two] notes, but they're adopting and sharing similar musical strategies for how to end this ostinato." This also has harmonic implications, as Dr. Decker suggests the sixth scale degree gives "a 5 1 sort of feeling, although with a sixth scale degree." (*Id.*, ER 237:11-15) Thus, the ostinatos share similarities across all eight notes of their melodies. (*Id.,* ER 236:13-238:19)

Dr. Decker's testified that this distinctive pitch sequence was "certainly, certainly" significant in his analysis of substantial similarity. (*Id.,* ER 226:21-227:2) In short, the melody in the "Joyful Noise" ostinato was not a mere copy of a scale; instead, the melody

30

was created by employing compositional techniques (rather than simply utilizing a stock or standard idea).

The District Court misconstrued Dr. Decker's testimony about the tendencies of scale degrees—and certainly did not credit the most favorable interpretation of that testimony, as required; instead, it misconstrued Dr. Decker's testimony as an admission that "the way the ostinato resolves is not so much original as it is necessary." (CR 527, ER 12) A full reading of the testimony cited by the district court shows that Dr. Decker was explaining, generally, to a lay audience what scale degrees represent and why they are useful. "[The first scale degree] 1 is the magnet against which individual notes in the scale are pulling or not. And scale degrees allow us to describe that...energy as it moves through a melody." (CR 542, ER 237:17-23) His testimony illustrated to the jury how scales work and how, in this instance, energy moved through the melodies in "Joyful Noise" and "Dark Horse" similarly, despite being in keys a half step apart. (*id.*, ER 221:9-224:3) "[T]his allows comparison of how notes in comparable melodies do the same sort of work or have the same sort of effect." (*Id.*, ER 223:5-11)

Dr. Decker never opined that the pitch sequence in the ostinatos was inevitable or commonplace; in fact, he testified the exact opposite, as detailed above. Moreover, despite the universe of music, no prior art was adduced by defendants showing the same pitch sequence in an ostinato, including a melody that continues past the "home note" and leaps again downward, with ostinatos defying resolution to the "1" or "home note" in the same manner.

Thus, a jury had ample evidence to conclude the pitch sequence was original and protectable on its own without all the other elements identified by Dr. Decker.

ii. **The district court relied upon an erroneous statement of law in ignoring Dr. Decker's testimony regarding the originality of the pitch sequence, thus undercutting the basis of its ruling.**

In overturning the jury's verdict and rejecting Dr. Decker's testimony regarding the originality of the ostinato melody, the district court erroneously asserted that "a pitch sequence . . . is not entitled to copyright protection." (CR 527, ER 13) Perhaps the district court didn't understand that a pitch sequence is the technical term for a sequence of musical notes, i.e., a melody. Copyright most definitely protects original melodies, and especially

32

distinctive 8-note melodies that repeat throughout a song. As this Court recently observed in *Skidmore, supra*, 952 F.3d at 1071, while a musical phrase consisting of just three notes might not meet "the 'quantum of creativity' required under *Feist*, [a]t the same time, we have not foreclosed the possibility that 'seven notes' could constitute an original expression."

Indeed, the music world is filled with examples of famous, distinctive, and unquestionably original 8-note two-bar repeating melodies that are as simple, if not simpler, than the one at issue here. One doesn't need a Ph.D. in musicology to understand that distinctive originality of the repeating two-bar guitar riff that opens and then repeats throughout the Rolling Stones song "(I Can't Get No) Satisfaction"[12]:



---

[12] *Easy Guitar Tab,* Guitar Control, https://guitar.com/beginner/easy-guitar-tab (last visited 10/9/20)

Or, from an earlier era, the even simpler (yet unquestionably distinctive) 8-note motif that opens and repeats in Beethoven's Fifth Symphony[13]:



Indeed, perhaps the best witness to the distinctive originality of the "Joyful Noise" ostinato melody is Katy Perry herself, who—as quoted above—immediately selected it from the instrumental beds played for her review, promptly called a prospective writing partner to urge her to come out the studio the very next day to help write the lyrics, and—when performing that song at the Super Bowl Halftime Show before more than 100 million viewers—deleted the introductory arpeggio so that the performance could start with the ostinato, which she testified was "the most identifiable part of the song."

---

[13] *Symphony No. 5 (Beethoven),* Wikipedia, https://en.wikipedia.org/wiki/Symphony_No._5_(Beethoven) (last visited 10/9/2020)

In short, the district court's erroneous statement of law that pitch sequence (i.e., a melody) "is not entitled to copyright protection" further undermines its ruling.

### iii. In ruling that the "Joyful Noise" ostinato was not original, the district court ignored key testimony by Dr. Decker on the originality issue while cherry-picking snippets of Dr. Ferrara's testimony that the jury found unpersuasive.

While the district court's misunderstanding of the meaning of "pitch sequence" may explain much of its dismissal of Dr. Decker's testimony regarding the originality of the ostinato melody, its descriptions of Dr. Decker's purported concessions and Dr. Ferrara's assertions do not withstand analysis under the governing standard of review.

Dr. Decker never stated that the pitch sequence in "Joyful Noise" was individually commonplace or a basic building block of music. Instead, he testified, without remarking on the ubiquity of any individual element, that "[i]t's the combination of [the elements]" which occur "in a context" that ultimately convinced him the works were substantially similar. (CR 542, ER 303:16-23) As he explained, in his academic field of musicology, "arguments about musical borrowing require multiple parameters." Nevertheless:

35

> I would say the bedrock for me here is the similar phrase lengths. The identical phrase lengths, the identical rhythm. The almost identical pitches. You know, the repetition pattern of four 3s followed by a step down to 2 in the minor mode. The combination of these things is what convinced me.

(*Id.*, ER 303:10-15) Dr. Decker never testified that each shared element was unoriginal or commonplace from either a musical or legal perspective. In fact, as discussed in the next subsection below, the opposite is true.

Further, Dr. Decker's testimony was strengthened by the fact that the two prior art examples offered by defendants' expert witness failed to demonstrate that the "Joyful Noise" ostinato was commonplace. Though Dr. Ferrara tried to contend that the melody in "Joyful Noise" was commonplace due to the presence of the first six scale intervals (3 3 3 3 2 2) in the songs "Jolly Old St. Nicholas," and "Merrily We Roll Along" (the "Prior Art"), Dr. Decker rejected that contention as fundamentally flawed. Specifically:

- He distinguished the Prior Art, stating that the six-note "3 3 3 3 2 2" was cherry-picked from these songs in the middle or end of a "tune" or "part of a larger structure. They must be understood in context." (*Id.*, ER 251:11-18) "In Merrily We Roll Along, this group of six notes happens at the end of the song. * * * [W]hen it uses these six scale degrees it's

36

headed toward a conclusion." By contrast, in "Jolly Old Saint Nicholas those six notes "are the opening notes of the tune. So they continue on to end the first line of the tune, the first four bars of the tune" (*Id.* at 217:23 to 218:8, ER 306:23-307:8) By contrast, in both "Joyful Noise" and "Dark Horse" that melody is an ostinato that keeps on repeating— a distinction he found "extremely significant." (*Id.*, ER 307:9-24)

- He testified that the Prior Art songs were not examples of prior use of the melody from "Joyful Noise." "It's the ostinato identity that's at issue here. Finding these six notes in a tune in the wrong mode does not for me create a connection between these [and 'Joyful Noise' or 'Dark Horse']." (CR 542, ER 307:21-24)

- He further testified to the significance of the musical fact that the Prior Art is written in the major mode, while "Joyful Noise" and "Dark Horse" are written in the minor mode. In the major mode, the third scale degree is a different pitch, or note, than in the minor mode, which Dr. Decker called the "substantive and unchanging difference" between modes. (*Id.*, ER 251:11-252:9) This is significant, because one of the identifying features of the two works at issue is "the repetition pattern of four 3s followed by a step down to 2 in the minor mode" on the same strong beat—thus,

37

Case: 20-55401, 10/13/2020, ID: 11856471, DktEntry: 14, Page 45 of 71

the musical effect achieved by the melody in the Prior

Art is quite different. (*Id.*, ER 303:9-15)

No other prior art containing "3 3 3 3 2 2" (especially with an additional leap downward) was adduced at trial.[14] Rather, a reasonable inference for the jury was that the eight-note pitch sequence in "Joyful Noise" is unique—particularly where coupled with Dr. Decker's testimony that he had never seen another piece of music with a melody such as the one in "Joyful Noise."

Finally, even without Dr. Decker's testimony, the particular Prior Art identified by Dr. Ferrara (namely, a Christmas carol from 1865 and a children's song from 1934) are insufficient as a matter of law to demonstrate that the "Joyful Noise" melody was unoriginal. *Swirsky*, 376 F.3d at 850 ("[a] musical measure cannot be 'common-place' by definition if it is shared by only two songs" and noting that prior art from different musical genres is a poor measure of

---

[14] Dr. Ferrara's three other examples contained either pitch content of "3, 2, 1, 5" or repeated notes. These fall short of proving that the ostinato in "Joyful Noise" was commonplace. Discussing the repeated third scale degree and the shift to the second scale degree on the fifth, strongest beat, Dr. Decker explained: "[T]hat's the moment that for me is particularly significant and signals to me through several different levels; right? Rhythm, pitch content, expressed as scale degrees, . . . and a pattern of repetition that these two pieces have a relationship to each other." (*Id.*, ER 230:17-231:5) Shared pitch content or repetition alone was unconvincing to Dr. Decker—and, more important, to the jury.

whether musical expression is commonplace "within the field of hip-hop/R & B").

### iv. Dr. Decker identified several other elements which, in combination with the pitch sequence, formed the distinctive ostinato in "Joyful Noise" and should be entitled to protection under the low standard for originality established by the Supreme Court in *Feist*.

Though Dr. Decker viewed the shared pitch sequence (melody) as the "bedrock" of his analysis, he testified that other shared elements informed his opinion that the two works were substantially similar:

Rhythm. While a rhythm of eighth notes itself is not rare, Dr. Decker opined that the way the rhythm unfolds in "Joyful Noise" (and "Dark Horse") is unique when viewed in context: "What's distinctive here is the rhythm of eight beats is completely even . . . with no syncopation." (CR 542, ER 227:3-15) Why did he deem that significant? As he testified, "these are squarely on the beat which is unusual. In popular music in America for the last 150 years, syncopation has been the thing that says American music and that's lacking here." (*Id.*, ER 227:17-22) Indeed, he testified this lack of syncopation was "noteworthy and I think kind of cool." (*Id.*, ER 228:2-9) In short, lack of syncopation was a creative choice.

39

Texture. Dr. Decker testified that the "texture" of both ostinatos was distinctive. The term "texture," he explained, can be thought of as "the vertical dimension of sound," "as the number of things that are going on" in the song. (*Id.*, ER 232:22-25) He continued: "I often talk about pop records being transparent, but thick. So that they're full of sounds, but they're mixed in a way that we can hear each of those sounds, can distinguish each of those sounds." (*Id.*, ER 233:13-17) But here, he explained, the textures of the two ostinatos are "remarkably empty," and this unique emptiness is especially prominent at the beginning of both songs: "[W]hen we first hear these ostinatos, they are in relative isolation . . . which directs your ear to it. It's the only thing to listen. It's the only music to hear. It's the only content." (*Id.*, ER 234:12-235:1)

In his expert opinion, the empty texture is "unusual for this kind of music." (*Id.*, ER 236:6-9) A reasonable juror could find that opinion significant. Today's pop music typically "thick"; but here the texture of the two songs' verses is empty in essentially the same way. When composing a song, an artist makes creative choices about what sounds to include in the song—and what sounds not to include. It is thus noteworthy that, when creating "Joyful Noise"

40

and "Dark Horse," the authors made the unusual choice of creating negative space and arranging it in a similar fashion—including having both songs introduce the ostinato in isolation.

Tambor. Dr. Decker further opined that tambor (i.e., "the color of sound") of the ostinatos' instrumentation is substantially similar, each consisting of pingy, synthesized tones in the same electronic family of sounds and in the treble voice. (*Id.*, ER 231:6-232:21) As Dr. Decker explained, the first thing he noticed about the two ostinatos is that "they don't suggest to my ear any real instruments." He continued:

> One of the ways we talk about tambor is we hear a sound and we go, oh, that's the sound or the color or the tambor of clarinets or the tambor of a piano. So we're making a reference to an instrument that we know produces sound and we understand that relationship. The sounds produced here do not . . . suggest any real instrument. * * * [T]hey're particularly high in the same way. They're treble voices. They have for me a pingy sound. * * * They sound like a tone you might hear on your phone; right? It's an artificial sound. It's an empty sound. It's artificial in that respect. So that's significant.

(*Id.*, ER 231:21-232:19*)*

Other Objective Similarities. Dr. Decker identified other similarities in the two ostinatos. While perhaps common when analyzed in isolation, he testified that these elements contributed to

an original combination in "Joyful Noise." Specifically, both phrases are written in the minor mode. (*Id.*, ER 228:20-229:17) Both phrases are eight notes in length. (*Id.*, ER 224:17-23) Both phrases are employed in the pieces as ostinatos, with structural importance in addition to repeating the eight-pitch phrase. (*Id.*)

In short, Dr. Decker identified numerous elements comprising the "Joyful Noise" ostinato. One element—the pitch sequence, or melody—was distinctive enough that Dr. Decker had never seen another piece that descended in the same way, except for "Dark Horse." He rebutted the only "prior art" adduced at trial, along with any claim that this type of melody is "commonplace" or a building block. Dr. Decker further identified two other elements—an even, square rhythm and sparse texture—that, though perhaps not individually copyrightable, were characterized as "unusual" and "noteworthy" among the field of alternative options for these two genres of music, making the "Joyful Noise" ostinato even more distinctive and original. *See Swirsky,* 376 F.3d at 850 (noting that unprotectable expression consists of those concepts "indispensable and naturally associated with the treatment of a given idea" in contrast to the unusual qualities here)

42

As such, the jury had ample evidence to conclude that the "Joyful Noise" ostinato contained an original combination of musical elements. *See Williams,* 895 F.3d at 1120 ("There is no one magical combination" of elements that permit a finding of originality); *Swirsky,* 376 F.3d at 848 (substantial similarity can be based upon unprotectable chord progression, rhythm, and pitch sequence); *Three Boys Music,* 212 F.3d at 485 (substantial similarity can be based upon combination of just five unprotectable elements).

There was no prior art adduced at trial demonstrating that this combination of elements existed elsewhere. *Three Boys Music,* 212 F.3d at 485 (upholding originality of combination where defense expert "had not found the combination of unprotectible elements..." in prior compositions) Thus, this distinctive combination clears the low threshold of protectable originality.

> **v. A jury following the District Court's jury instructions could reasonably find substantial similarity between "Joyful Noise" and "Dark Horse" based on the foregoing elements.**

As to application of the "extrinsic" test, the jury was properly instructed that it "must inquire only whether the protectable

elements, standing alone, are substantially similar, and must filter out and disregard the non-protectable." (CR 441, Jury Instr. 37, ER 428) Moreover, the district court instructed the jury on defendants' contention that "any similarities between" the two ostinatos "comprise solely of non-original and unprotectable common-place expression." (*Id.*, Jury Instr. 34, ER 425)

The jury was also instructed that an author is "entitled to prevent others from copying original, protectable expression in the author's work" (*id.*) and that "original parts of the plaintiffs' work are the parts created: (1) independently by the work's author, that is, the author did not copy it from another work; and (2) by use of at least some minimal creativity. In copyright law, the 'original' part of a work need not be new or novel." (*Id.*, Jury Instr. 32, ER 423)

Finally, the jury was instructed that "a combination of unprotectable elements may be eligible for copyright protection if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." (*Id.*, Jury Instr. 34, ER 425)

As discussed above, the originality requirement sets a low bar for protection, and Ninth Circuit law accords broad protection to a

44

wide variety of musical elements, taken alone and in combination. The standard of review requires only that plaintiffs provided "indicia of sufficient disagreement [between the experts] concerning the substantial similarity of the two works." *Swirsky*, 376 F.3d at 846 (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1472 (9th Cir. 1992)).

Drawing all inferences in favor of the plaintiffs, a jury properly applying these legal standards could reasonably find the ostinatos in "Joyful Noise" and "Dark Horse" substantially similar in protectable expression—specifically, that (1) the two songs share a substantially similar melody in their verses, and (2) that the combination of numerous elements in the two ostinatos are otherwise replicated in a substantially similar way.

Though defendants attempted to highlight the few minor differences between the two ostinatos at trial, Dr. Decker distinguished each of them, demonstrating how each represented either (1) a point of further similarity, or (2) were negligible.  Indeed, much of the alleged difference between the works is simply semantic disagreement—a clash between two experts. While Defendants argue that the pitches on beats 7 and 8 of the ostinatos

45

are not identical, Dr. Decker explained that "Joyful Noise models two ways to end this ostinato and Dark Horse uses both in every repetition," highlighting the endings as a similarity. (CR 542, ER 238:1-19)

Though the songs' tempos were not identical, "both of these tracks [are] moderately paced. They are not dance tracks, they are not fast and they are not ballads. They are similar in their moderate tempos." (*Id.*, ER 241:22-24) Though the respective ostinatos occur throughout "Joyful Noise" and in just the verses and post-chorus of "Dark Horse," Dr. Decker notes the similarity that each ostinato is employed in relative isolation as the musical bed for lyrics in the verses. (*Id.*, ER 234:12-235:1)

Other differences were negligible. For instance, Dr. Decker explained that certain "portamentos" identified by Dr. Ferrara are "[not] part of the structure of the ostinato. They're decorative and . . . ornamental." (*Id.*, ER 253:11-254:12)[15] With respect to the key of

---

[15] This Court has previously acknowledged that an expert's musicological analysis properly disregarded notes where expert "regarded those notes as not structural; they are ornamental." *Swirsky*, 376 F.3d at 846-47.

the songs, "[t]hat difference is negligible when you translate these into scale degrees" because "the two pieces that are a half step apart could not be closer [musically]." (*Id.*, ER 239:8-240:7) While Dr. Ferrara identified certain differences in harmony and harmonic rhythm in the songs' choruses, Dr. Decker's objective analysis of the works focused on the remarkable similarities in the verse sections—or approximately 45 percent of "Dark Horse." Moreover, while Dr. Ferrara argues that the "Joyful Noise" ostinato is a 16-note phrase, Dr. Decker understands it as an eight-note repeating figure with alternating endings, a difference of conceptualization. (*Id.*, ER 218:23-25)

Given the posture of this appeal, the applicable standard of review, and Dr. Decker's extensive testimony about the works' similarities (both in their melodies and in their combination of elements), the jury had ample evidence to conclude the works were substantially similar.

47

**D. The district court erred by attempting to apply a "thin copyright" standard to the same evidence regarding plaintiff's musical composition that the jury presumably determined was entitled to more than "thin" protection.**

Another material flaw in the district court's analysis was its application of the "virtually identical" version of substantial similarity under the so-called "thin copyright" standard. Over plaintiffs' objection, the district court elected to give the jury a "thin copyright" instruction (CR 441, Jury Instr. 34, ER 425).[16]

Regardless whether Jury Instruction 34—or for that matter, whether any "thin copyright" instruction—should ever be given in a music copyright case, that instruction expressly limited the jury's application of the "thin copyright" standard to a situation "when a work embodies only the minimum level of creativity necessary for copyright." (*Id.*, ER 425)

However, the issue of extrinsic similarity in Question 2 of the special verdict form—a question drafted by defendants—did *not*

---

[16]The district court mistakenly asserts that "no party objected to this instruction." In fact, plaintiffs did object—and did so on the ground that the "thin" copyright analysis "is not applicable to this case * * * Inclusion of this instruction would be an improper instruction and misstatement of law." (CR 425, ER 467; *see, also,* CR 545, ER 100:17-102:25)

require a finding of "virtual identity." That determination, along with the relevance of the "thin copyright" instruction, was left to the jury, and their verdict, based on their assessment of the testimony and evidence (including the credibility of witnesses), is, at the very least, an implied finding that the "thin copyright" standard did not apply here. Thus even though a "thin copyright" instruction was not proper, it did not compel the jury to apply it but only stated what that "virtual identity" standard would apply if, *and only if*, the jury determined the ostinato fit within the parameters of a thin copyright.

Nevertheless, the district court applied the "thin copyright" standard in its post-trial determination that plaintiffs were required to prove by a preponderance of the evidence that the two ostinatos were "virtually identical." This was not only contrary to the evidence but a misreading of this Court's precedents. As this Court reiterated in *Skidmore, supra*, at 1075 n. 13 (citation omitted):

> But to be clear, we do not recognize a separate, heightened standard for proving actionable copying. The standard is always substantial similarity. Of course the degree of overlap in original expression that is required for the similarity to be substantial is determined by the range of possible protectable expression. More similarities are required to infringe if the range of

49

protectable expression is narrow, because the similarities between the two works are likely to cover public domain or otherwise unprotectable elements

Here, a reasonable juror could determine from the evidence at trial that the overlap of the elements identified by Dr. Decker, even if each was one of just several possibilities, contained a multitude of creative choices. For example, a melody of eight pitches from a single octave of the seven-note minor scale offers hundreds, if noy thousands, of possible melodic combinations. Unlike, say, the names in a telephone directory (*Feist, supra*) or other factual compilations, e.g., *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989), each pitch in a melody is a product of creative choice. Each additional element presents new creative choices to the author, and each choice further distinguishes a musical combination. What mode to write in? What instruments or tambor to choose? How will the rhythm unfold? Should there be syncopation? What about harmonization? How often should this gesture repeat, or should it repeat at all?

In short, the combination of elements in the ostinatos shared in "Joyful Noise" and "Dark Horse" belies substantial replication by pure accident—particularly where Dr. Decker testified as to the

50

unusual qualities of certain of the song's elements, including its pitch sequence, lack of syncopation, and empty texture. Unlike sitting down to sculpt a jellyfish, *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003), a music artist has a wide array of potentialities and is in no way automatically likely to create something like the ostinato "Joyful Noise—as the jury unanimously concluded.

Thus, the district court's attempt to shoehorn the evidence into a "thin copyright" standard was erroneous. The question of substantial similarity was properly left to the jury to answer.

### E. The District Court erred by relying upon evidence outside the trial record to justify reversal of the jury's verdict.

The district court granted a group of fifteen self-described musicologists leave to file an *amicus curiae* brief in support of defendants' Rule 50(b) post-trial motion. Plaintiffs opposed the filing of that brief, in part, because it urged reversal of the jury's verdict based on purported "evidence" outside the trial record and untested by the trial process. Plaintiffs argued that such information was highly prejudicial and not properly considered under the legal standard for post-trial motions, which focuses the scope of the district court's review on evidence *presented at trial*. Nevertheless,

51

the district court permitted the filing of the *amicus* brief and, as quoted above, expressly relied upon *amici's* unsubstantiated "evidentiary" submissions in summarily discounting critical trial evidence in favor of plaintiffs.

Aside from the fact that this submission of post-trial hearsay is improper in connection with a Rule 50(b) motion, *amici* failed to (1) explain how RISM or Themefinder.org works, (2) provide transcriptions or even descriptions of the prior art examples, (3) explain what constitutes a "match" on these databases, (4) analyze whether these prior art examples are useful in determining if the pitch sequence is common in pop music, given that most of the prior art were apparently compositions from the 18th and 19th centuries, or (5) explain whether any of the examples were repeating figures or how these notes were otherwise deployed in the context of the larger compositions. Moreover, this "extra-judicial" evidence was submitted by a group of individuals who not certified as expert witnesses and whose opinions (and music databases) were neither presented not tested at the trial. In other words, this post-trial submission would have failed the expert testimony threshold for an *in-trial* submission.

Nevertheless, the district court permitted submission of this "evidence" and quoted and relied upon it in dispensing with the expert testimony of Dr. Decker and the jury's findings. Specifically, the district court stated that the pitch sequence in "Joyful Noise," even while viewing the evidence in the light most favorable to plaintiffs, "is not a particularly unique or rare combination." (CR 527, ER 20) In reaching this conclusion, the district court cites to and repeats hearsay assertions in the *amici*'s brief, namely, that their experiments had purportedly identified the pitch sequence in other unspecified compositions. *Id.*

This improper reliance on this post-trial hearsay in ruling on a Rule 50(b) motion is yet another reason to reinstate the jury's unanimous verdict.[17]

## II. The district court's "new trial" hypothetical ruling on damages conflicts with its affirmation of the jury's damages calculation.

While the district court denied defendants' motion for a new trial as moot, it stated that if it had not granted judgment as a

---

[17] Indeed, the "evidence" presented in that *amici* brief, presumably with defendants' approval, is a tacit admission by defendants of the insufficiency of the "prior art" evidence they submitted at the trial.

matter of law it "would have exercised its discretion to order a new trial on damage unless plaintiff accepted a remittitur." (CR 527, ER 31)

A district court's decision concerning a motion for a new trial is reviewed for an abuse of discretion. *See, e.g., S.E.C. v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011). Such a motion can be granted only if the verdict "is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *Id.*

The district court's own rulings on the damages issues in the Rule 50(b) portion of its order—namely, that the jury's award of 22.5 percent of the defendants profits and the jury's refusal to deduct Capitol Records' purported overhead were "based on substantial evidence, and not contrary to law"—refute any basis for a new trial.

Instead, the district court cites to what it describes as "powerful testimony that it was Katy Perry's star power and Capitol Records' marketing efforts (not plaintiffs' ostinato) that generated 'Dark Horse's' commercial success." (CR 527, ER 31)

54

While we agree that one of defendants' many experts—Jason King—testified about the purported value of Ms. Perry's star power and Capitol Records' marketing efforts (CR 549, ER 53-93), we deny that such testimony could be deemed "powerful." Even a passing scrutiny reveals that this testimony is powerfully *self-refuting* for at least the following reasons:

Ms. Perry's star power. "Dark Horse" was just one of 13 tracks on the original *Prism* album and just one of 16 tracks on the deluxe version of that album. While "Dark Horse" was indeed a big hit, most songs on that album were not. And yet Ms. Perry was the lead singer on every one of those tracks. Thus, the jury could easily have determined that her "star power" was *not* a principal driving for the unique success of "Dark Horse."

Capitol Records' marketing efforts. This reason makes sense only if we assume that a sophisticated music label decides which of 13 songs to promote by asking a Magic 8 Ball. As defendants' expert conceded, the Capitol Records marketing efforts began around the time "Dark Horse" was released as a single in December of 2013. That was months after the Pepsi/MTV promotional contest between "Dark Horse" and another song on that album, and also months

after the promotional release of "Dark Horse" in the early fall. Why was that one song—among all 13 songs on the original album and all 16 songs on the premium album—given special promotional release status? Again, it was not due to Capitol Records' marketing efforts or Ms. Perry's star power. No, there was obviously something special about the song and in particular about that ostinato—which immediately captured Ms. Perry's interest back when she first heard that ostinato in the studio. And there was certainly something special about that ostinato that caused her to omit the introductory 18-second arpeggio in her Super Bowl Halftime Show performance and instead open that performance with the "Dark Horse" ostinato at issue. As she explained, that ostinato "is the most identifiable part of the song I'd imagine." (CR 541, ER 322)

And we cannot ignore that the jury, after hearing all that evidence, awarded plaintiffs 22.5% of the profits. Perhaps some of that reduction from the requested 45% was due to Ms. Perry's star power or Capitol Records' marketing money. Either way, the evidence on the issue of damages (which the district court described as "substantial") and the district court's reasons for upholding the jury's special verdict on the damages portion of the trial are the very

same evidence and the very same reasons that refute the basis for its provisional decision regarding a new trial on damages.[18]

### III. Plaintiffs' request for an award of prejudgment interest on that portion of the profits earned by defendants nearly five years before entry of the judgment was fair and just; accordingly, the district court's denial of that request was an abuse of discretion.

A district court's decision on an award of prejudgment interest is reviewed for an abuse of discretion. *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013).

Here, the district court denied as moot plaintiffs' motion for an award of prejudgment interest. However, it stated that if it had left the jury verdict in place, it "would have exercised its discretion to a decline plaintiffs' claim for prejudgment interest for this reason." What reason is that? "This case presented difficult questions of not clearly-settled copyright law. Fully litigating the

---

[18] We note the hubris of defendants' argument. Katy Perry and Capitol Records made millions of dollars in profits from their infringing acts. Yes, Ms. Perry is a pop star. Yes, Capitol Records is a marketing powerhouse. And yes, they used those two advantages to increase the profits they earned from exploitation of plaintiffs' creation. And they have succeeded. After all, the jury verdict allows both of them to keep nearly 80% of those profits.

dispute through trial was accordingly 'not needless delay.'" (CR 527, ER 32.)

But plaintiffs' motion was not based on "needless delay." Instead, it was based on the undisputed fact that each of these defendants, by the end of 2014—nearly five years before entry of the jury verdict in September of 2019—had already earned far more in profits than the 22.5% awarded by the jury.

That undisputed fact is precisely why this Court held that in copyright cases "prejudgment interest ordinarily should be awarded." *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1552 (9th Cir. 1989). As the Court explained, the reasons for awarding prejudgment interest are grounded in basic notions of fairness and equity (*id.*) (citations omitted):

> Awarding prejudgment interest on the apportioned share of defendant's profits is consistent with the purposes underlying the profits remedy. Profits are awarded to the plaintiff not only to compensate for the plaintiff's injury, but also and primarily to prevent the defendant from being unjustly enriched by its infringing use of the plaintiff's property. For the restitutionary purpose of this remedy to be served fully, the defendant generally should be required to turn over to the plaintiff not only the profits made from the use of his property, but also the interest on these profits, which can well exceed the profits themselves. Indeed, one way to view this interest is as another form of indirect profit accruing

58

from the infringement, which should be turned over to the copyright owner along with other forms of indirect profit. It would be anomalous to hold that a plaintiff can recover, for example, profits derived from the promotional use of its copyrighted material, but not for the value of the use of the revenue generated by the infringement.

As such, the issue of delay is irrelevant. Whether this lawsuit took two years from filing to judgment or, as here, more than five years, "[a]warding prejudgment interest on the apportioned share of defendant's profits is consistent with the purposes underlying the profits remedy." (*Id.*)

Other Circuits have looked for guidance to this Court's rulings on prejudgment interest in copyright cases. For example, the Third Circuit quoted this Court's decision in *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 718 (9th Cir. 2004) in reversing the district court's denial of prejudgment interest, emphasizing the unjust enrichment basis for such an award:

> An award of actual damages under the Copyright Act alone "does not mitigate harm caused by delay in making reparations—a harm the remedy of prejudgment interest is uniquely tailored to address. Simply put, prejudgment interest is a different remedy for a different harm." *Polar Bear Prods.*, 384 F.3d at 718. Prejudgment interest "mak[es] the claimant whole and prevent[s] unjust enrichment."

59

*Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 396–97 (3d Cir. 2016) (citation omitted). Thus, as the Third Circuit held, a district court's denial of prejudgment interest is an abuse of discretion when not "exercised in light of considerations of fairness." (*Id.*)

Here, too, the district court's denial of prejudgment interest fails the "considerations of fairness" standard. The five-year gap between the filing and the trial of this lawsuit was not the result of "needless delay." But that is no justification to support the district court's departure from what this Court has described as "the restitutionary purpose of this remedy." For that purpose "to be served fully, the defendant generally should be required to turn over to the plaintiff not only the profits made from the use of his property, but also the interest on these profits." *Frank Music Corp., supra*, at 1552.

Basic notions of fairness urge that, at the very latest, prejudgment interest should be assessed on the jury's award of profits beginning no later than January 1, 2015 through entry of the judgment. Otherwise, defendants would retain the benefit derived from the time-value and use of their wrongful profits.

60

Because the district court denied this motion, it did not address the appropriate prejudgment interest rate and whether that interest should be compounded. Both issues were fully briefed by the parties. Should this Court decide to remand with instructions on those two issues, we note that *Frank Music Corp., supra,* at 155, addresses the appropriate interest rate ("based on the 52-week Treasury bill rate") and *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 842 (9th Cir. 2012) affirmed compound interest rather than simple interest, explaining that "[a]nyone with a savings account, credit card, mortgage, or student loan knows that the modern financial world employs compound interest as a general rule."

## CONCLUSION

This Court should:

1. Reverse the district court's grant of defendants' motion for judgment as a matter of law and its provisional grant of defendants' motion for a new trial on damages;

2. Reinstate the jury's verdicts as to liability and damages;

3. Reverse the district court's denial of plaintiffs' motion for prejudgment interest; and

4.    Remand the case to the district court for the calculation

and addition of prejudgment interest to the damage award.

Respectfully submitted,

/s/ Michael A. Kahn
Capes Sokol
8182 Maryland Ave., 15th Floor
St. Louis, MO 63124
Tel: 314-505-5406
Email: kahn@capessokol.com

Attorney for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Ninth Circuit Rule 32-1(a) because it contains 12,125 words. This brief also complies with the typeface and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using Word 14-point Bookman Old Style font.

/s/ Michael A. Kahn
Michael A. Kahn
Attorney for Appellants

63

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2020, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Michael A. Kahn
Michael A. Kahn
Attorney for Appellants