**Docket No. 20-55401**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

MARCUS GRAY, PKA Flame, et al.,

*Plaintiffs-Appellants,*

v.

KATHERYN ELIZABETH HUDSON, PKA Katy Perry, et al.

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the Central District of California,*
*D.C. No. 2:15-cv-05642-CAS-JC · Honorable Christina A. Snyder*

# APPELLEES' BRIEF

CHRISTINE LEPERA, ESQ.
JEFFREY M. MOVIT, ESQ.
JACOB D. ALBERTSON, ESQ.
J. MATTHEW WILLIAMS, ESQ.
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Avenue 25th Floor
New York, New York 10022
(212) 509-3900 Telephone
(212) 509-7239 Facsimile

AARON M. WAIS, ESQ.
GABRIELLA A. NOURAFCHAN, ESQ.
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East 18th Floor
Los Angeles, California 90067
(310) 312-2000 Telephone
(310) 312-3100 Facsimile

*Attorneys for Appellees Lukasz Gottwald, Sarah Theresa Hudson,*
*Karl Martin Sandberg, Henry Russell Walter, Kasz Money, Inc.,*
*Capitol Records, LLC, WB Music Corp. and Kobalt Music Publishing America, Inc.*

VINCENT H. CHIEFFO, ESQ.
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067
(310) 586-7700 Telephone
(310) 586-7800 Facsimile

*Attorney for Appellee Katheryn Elizabeth Hudson*

 COUNSEL PRESS · (213) 680-2300   PRINTED ON RECYCLED PAPER

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees Kasz Money, Inc., Capitol Records, LLC, WB Music Corp. and Kobalt Music Publishing America, Inc. state as follows:

1.     Appellee Kasz Money, Inc. does not have a parent corporation and no publicly owned company owns ten percent (10%) or more of Kasz Money, Inc.

2.     Appellee Capitol Records, LLC's parent companies include Virgin Records CM Holding, Inc., a Delaware corporation; EMI RM US, Inc., a Delaware corporation; EMI Group, Inc.; a Delaware corporation; Universal Music Group, Inc., a Delaware corporation, and Concerto Investment BV.  The ultimate parent of Capitol Records, LLC is Vivendi, S.E., a publicly traded French corporation.

3.     Appellee WB Music Corp. (now known as W Chappell Music Corp. dba WC Music Corp.) discloses that it is a wholly-owned indirect subsidiary of Warner Music Group Corp., which is a publicly traded company with more than ten percent of its stock owned by AI Entertainment Holdings LLC and certain of its affiliates, which are not publicly traded companies.

4.     Appellee Kobalt Music Publishing America, Inc. discloses that its parent company is Kobalt America Holdings, Inc., which is wholly-owned subsidiary of Kobalt London Limited, which is a wholly-owned subsidiary of Kobalt Music Group Limited.  No publicly owned company owns ten percent (10%) or more of Kobalt Music Publishing America, Inc.

DATED: March 29, 2021            MITCHELL SILBERBERG & KNUPP LLP

By: /s/ Christine Lepera
Christine Lepera
Jeffrey M. Movit
Jacob D. Albertson
J. Matthew Williams
Aaron M. Wais (SBN 250671)
Gabriella A. Nourafchan (SBN 301594)
Attorneys for Appellees Capitol Records, LLC,
Lukasz Gottwald, Sarah Theresa Hudson,
Karl Martin Sandberg, Henry Russell Walter,
W Chappell Music Corp. (f/k/a WB Music
Corp.), Kobalt Music Publishing America, Inc.,
and Kasz Money, Inc.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ................ 1

COUNTERSTATEMENT OF THE ISSUES ............................................. 6

COUNTERSTATEMENT OF THE CASE .............................................. 7

    I.    Appellees And The Creation Of "Dark Horse" .................................. 7

    II.   Appellants And The Creation Of "Joyful Noise" ............................... 9

    III.   Appellants' Expert's Admissions Demonstrated There Was No Substantial Similarity As A Matter of Law ......................................... 9

    IV.   Appellants' Evidence Was Insufficient To Prove Access ................. 10

        A.   Appellants Did Not Prove "Joyful Noise" Was Widely Disseminated Prior To The Creation Of "Dark Horse" ............ 10

        B.   The Evidence Showed Appellees Did Not Avail Themselves Of The Opportunity To Hear "Joyful Noise" ....... 13

    V.   The Trial Evidence Does Not Support The Jury's Damages Award . 14

    VI.   The District Court's Decision ......................................................... 16

        A.   The District Court's Rulings Regarding The Lack Of Substantial Similarity Between "Joyful Noise" And "Dark Horse" ......................................................................17

        B.   The District Court's Rulings Regarding Damages ................... 19

        C.   The District Court's Rulings Regarding Other Issues Raised By Appellees .................................................................19

        D.   The District Court's Rulings Regarding Prejudgment Interest ................................................................................19

STANDARD OF REVIEW ............................................................... 20

    I.    Rule 50(b) Motion For Judgment As A Matter Of Law ................. 20

i

# TABLE OF CONTENTS
(continued)

**Page**

II. Rule 59 New Trial Standard ................................................................ 22

ARGUMENT ............................................................................................... 24

I. General Copyright Infringement Standards ...................................... 24

II. The District Court Properly Granted Appellees Judgment As A Matter Of Law On The Dispositive Issue Of Substantial Similarity ....................................................................................... 26

    A. Copyright Law Does Not Protect Commonplace Expression ............................................................................. 26

        1. The Extrinsic Test Requires Dissection And Extraction Of Unprotectable Elements .......................... 27

        2. A Combination Of Commonplace Elements Is Only Protectable If Those Elements Are Sufficiently Numerous And Their Selection And Arrangement Is Sufficiently Original ...................................................... 28

        3. A Combination Of A Few Commonplace Elements Has A Narow Range Of Expression Entitled Only To A "Thin Copyright" ...................................................... 29

    B. The District Court Properly Applied The Extrinsic Test And Correctly Granted Appellees Judgment As A Matter of Law ............................................................................. 30

        1. The District Court Correctly Held That, Based On Appellants' Expert's Own Admissions, The Claimed Similarities Are Not Individually Protectable ............... 31

        2. The District Court Correctly Held The JN Ostinato Does Not Contain A Protectable Combination Of Commonplace Elements ................................................ 39

ii

**TABLE OF CONTENTS**
(continued)

**Page**

3.    The District Court Correctly Held, In The Alternative, That (a) The JN Ostinato Would Only Be Entitled To A Thin Copyright, And (b) The Ostinatos At Issue Are Not Virtually Identical ............................ 42

    a.    The District Court Correctly Applied The Thin Copyright Doctrine To The Works At Issue ....... 42

    b.    Appellants Cannot Challenge That The Thin Copyright Doctrine Applies To Musical Compositions ..................................................... 46

C.    Appellees Are Entitled To Judgment As A Matter of Law On The Intrinsic Test ................................................ 47

III.    In the Alternative, The Court Should Affirm Based On Insufficient Evidence To Support The Jury's Finding Of Access ..... 48

A.    Appellants Mischaracterized The "Widespread Dissemination" Doctrine At Trial ............................................. 50

B.    Appellants Failed To Prove "Joyful Noise" Was Widely Disseminated .......................................................... 52

    1.    Appellants' Evidence Of Distribution Of "Joyful Noise" In Traditional Media Was Insufficient ............. 52

    2.    The View Counts Of "Joyful Noise" On YouTube And Myspace Were *De Minimis* ................................. 53

IV.    In The Alternative, The Court Should Affirm Based On Appellees' Unrebutted Evidence Of Independent Creation ............... 60

V.    In The Alternative, The Court Should Affirm To The Extent The Decision Calls For A New Trial On Liability And Damages ............ 62

A.    The Jury's Liability Findings Were Against The Clear Weight Of The Evidence ......................................................... 62

iii

## TABLE OF CONTENTS
(continued)

| | **Page** |
|---|---|
| B. The Jury's Damages Award Was Excessive | 63 |
| VI. The Court Should Affirm The Denial Of Appellants' Motion For Prejudgment Interest | 65 |
| CONCLUSION | 67 |
| CERTIFICATE OF COMPLIANCE | 68 |
| STATEMENT OF RELATED CASES | 69 |
| CERTIFICATE OF SERVICE | 70 |

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
722 F.2d 988 (2d Cir. 1983) ..................................................................50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................20

*Archibald v. Cty. of San Bernardino*,
2018 WL 6017032 (C.D. Cal. Oct. 2, 2018) .......................................32

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
581 F.3d 1138 (9th Cir. 2009) .........................................................48, 49

*Barnard v. Theobald*,
721 F.3d 1069 (9th Cir. 2013) ..............................................................23

*Batiste v. Lewis*,
976 F.3d 493 (5th Cir. 2020) ................................................................59

*Batts v. Adams*,
2011 WL 13217923 (C.D. Cal. Feb. 8, 2011) .................................53, 59

*Benay v. Warner Bros. Entm't*,
607 F.3d 620 (9th Cir. 2010) ................................................................31

*Bernal v. Paradigm Talent & Literary Agency*,
788 F.Supp.2d 1043 (C.D. Cal. 2010) ................................................48

*Bouchat v. Baltimore Raven Football Club, Inc.*,
346 F.3d 514 (4th Cir. 2001) ................................................................65

*Brighton Collectibles Inc. v. Coldwater Creek Inc.*,
2009 WL 160235 (S.D. Cal. Jan. 20, 2009) ........................................66

*Buchanan v. Sony Music Entm't*,
2020 WL 2735592 (D.D.C. 2020) ........................................................50

*Calhoun v. Lillenas Publ'g*,
298 F.3d 1228 (11th Cir. 2002) ........................................................40, 61

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)............................................................................26

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) .............................................................47

*Chess v. Dovey*,
   790 F.3d 961 (9th Cir. 2015) .............................................................31

*Cnty. of Suffolk v. Long Island Lighting Co.*,
   907 F.2d 1295 (2d Cir. 1990) ............................................................22

*Cream Records Inc. v. Jos. Schlitz Brewing Co.*,
   754 F.2d 826 (9th Cir. 1985) .............................................................64

*Darrell v. Joe Morris Music Co.*,
   113 F.2d 80 (2d Cir. 1940) ................................................................39

*Dash v. Mayweather*,
   731 F.3d 303 (4th Cir. 2013) .............................................................64

*E.E.O.C. v. Go Daddy Software, Inc.*,
   581 F.3d 951 (9th Cir. 2009) .............................................................20

*Erickson v. Blake*,
   839 F.Supp.2d 1132 (D. Or. 2012) ....................................................47

*Ets-Hokin v. Skyy Spirits, Inc.*,
   323 F.3d 763 (9th Cir. 2003) .............................................................46

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
   762 F.3d 829 (9th Cir. 2014) ...............................................22, 23, 62

*Feist Publ'n, Inc. v. Rural Telephone Serv. Co. Inc.*,
   499 U.S. 340 (1991)...........................................................................26

*Fenner v. Dependable Trucking Co., Inc.*,
   716 F.2d 598 (9th Cir. 1983) .............................................................23

vi

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Folkens v. Wyland Worldwide, LLC*,
  882 F.3d 768 (9th Cir. 2018) ........................................................................29

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
  772 F.2d 505 (9th Cir. 1985) ........................................................................64

*Frybarger v. Int'l Bus. Machines Corp.*,
  812 F.2d 525 (9th Cir. 1987) ........................................................................29

*Gable v. Nat'l Broad. Co.*,
  727 F.Supp.2d 815 (C.D. Cal. 2010),
  *aff'd* 438 F.App'x 587 (9th Cir. 2011) ........................................................48

*Gaste v. Kaiserman*,
  863 F.2d 1061 (2d Cir. 1988) ...................................................................28, 34

*Genthe v. Lincoln*,
  383 F.3d 713 (8th Cir. 2004) ........................................................................21

*Guzman v. Hacienda Records and Rec. Studio, Inc.*,
  808 F.3d 1031 (5th Cir. 2015) ......................................................................59

*Home Design Servs, Inc. v. Turner Heritage Homes, Inc.*,
  101 F.Supp.3d 1201 (N.D. Fla. 2015) ..........................................................21

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) ......................................................................21

*In re Letterman Bros. Energy Sec. Lit.*,
  799 F.2d 967 (5th Cir. 1986) ........................................................................21

*Jane Russell Designs, Inc. v. Mendelson & Assocs., Inc.*,
  114 F.Supp.2d 856 (D. Minn. 2000).............................................................50

*Jason v. Fonda*,
  526 F.Supp. 774 (C.D. Cal. 1981) ................................................................50

*Jerden v. Amstutz*,
  430 F.3d 1231 (9th Cir. 2005) ......................................................................23

# TABLE OF AUTHORITIES
<u>(continued)</u>

<u>**Page(s)**</u>

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*,
   322 F.3d 26 (1st Cir. 2003)............................................................................66

*Josephs v. Pac. Bell*,
   443 F.3d 1050 (9th Cir. 2006) ....................................................................20

*Kaseberg v. Conaco, LLC*,
   260 F.Supp.3d 1229 (S.D. Cal. 2017)..........................................................47

*Lakeside-Scott v. Multnomah Cnty.*,
   556 F.3d 797 (9th Cir. 2009) ......................................................................21

*Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*,
   345 F.3d 1140 (9th Cir. 2003) ....................................................................20

*Lillie v. ManTech Int'l Corp.*,
   837 F.App'x 455 (9th Cir. 2020) ................................................................22

*Loomis v. Cornish*,
   2013 WL 6044349 (C.D. Cal. Nov. 13, 2013),
   *aff'd* 836 F.3d 991 (9th Cir. 2016)........................................................52, 53

*Loomis v. Cornish*,
   836 F.3d 991 (9th Cir. 2016) ....................................................48, 49, 53, 59

*Lucky Break Wishbone Corp. v. Sears, Roebuck & Co.*,
   2008 WL 11344630 (W.D. Wash. Dec. 24, 2008) ......................................66

*Mackie v. Reiser*,
   296 F.3d 909 (9th Cir. 2002) ......................................................................63

*Mag Jewelry Co., Inc. v. Cherokee, Inc.*,
   496 F.3d 108 (1st Cir. 2007)........................................................................21

*Marya v. Warner/Chappell Music, Inc.*,
   131 F.Supp.3d 975 (C.D. Cal. 2015) ..........................................................24

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010) ......................................................................46

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*McRae v. Smith*,
    968 F.Supp. 559 (D. Colo. 1997)..................................................................49

*Merrill v. Paramount Pictures Corp.*,
    2005 WL 3955653 (C.D. Cal. Dec. 19, 2005)....................................................48

*Moi v. Chihuly Studio, Inc.*,
    -- F.App'x --, 2021 WL 777781 (9th Cir. Mar. 1, 2021)...................................24

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) .................................................................22, 23

*Morrill v. Stefani*,
    338 F.Supp.3d 1051 (C.D. Cal. 2018) ..............................................................47

*Newton v. Diamond*,
    204 F.Supp.2d 1244 (C.D. Cal. 2002) ..............................................................39

*Newton v. Diamond*,
    388 F.3d 1189 (9th Cir. 2004) .........................................................................27

*Nichols v. Universal Pictures Corp.*,
    45 F.2d 119 (2d Cir. 1930) ..............................................................................47

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014) .........................................................................22

*Oravec v. Sunny Isles Luxury Ventures, L.C.*,
    527 F.3d 1218 (11th Cir. 2008) .......................................................................28

*Palmieri v. Estefan*,
    35 U.S.P.Q.2d 1382 (S.D.N.Y. 1995)...............................................................57

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ...........................................................................63

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)...............................................................................20, 61

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rice v. Fox Broadcasting Co.*,
330 F.3d 1170 (9th Cir. 2003) .......................................................49, 50

*Satava v. Lowry*,
323 F.3d 805 (9th Cir. 2003) .....................................................27, 29, 42

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
309 U.S. 390 (1940)...................................................................................64

*Skidmore v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) ..........................................................*passim*

*Smith v. Jackson*,
84 F.3d 1213 (9th Cir. 1996) .................................................................27

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
464 U.S. 417 (1984)...................................................................................26

*Stewart v. Abend*,
495 U.S. 207 (1990)...................................................................................27

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) .................................................28, 37, 38

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000) .................................................38, 48, 60

*William Hablinski Architecture v. Amir Construction, Inc.*,
2007 WL 9734429 (C.D. Cal. Feb. 28, 2007) .................................65

*Williams v. Gaye*,
895 F.3d 1106 (9th Cir. 2018) ...............................................................62

*Willis v. Marion Cnty. Auditor's Office*,
118 F.3d 542 (7th Cir. 1997) .................................................................21

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) ...............................................................31

x

# TABLE OF AUTHORITIES
<u>(continued)</u>

**Page(s)**

### STATUTES

17 U.S.C.
 § 103 ............................................................................................................24
 § 106 ............................................................................................................61
 § 411(a) ........................................................................................................24
 § 501 ............................................................................................................61
 § 504(b) ........................................................................................................63

### OTHER AUTHORITIES

Fed. R. Civ. P.
 Rule 50 ..................................................................................................*passim*
 Rule 59 ...........................................................................................17, 22, 62

xi

Defendants-Appellees Katheryn Elizabeth Hudson (p/k/a Katy Perry) ("Perry"), Lukasz Gottwald (p/k/a Dr. Luke), Sarah Theresa Hudson, Karl Martin Sandberg (p/k/a Max Martin), Henry Russell Walter (p/k/a Cirkut), Kasz Money, Inc. ("KMI"), Capitol Records, LLC ("Capitol"), W Chappell Music Corp. (f/k/a WB Music Corp.) ("WC"), and Kobalt Music Publishing America, Inc. ("Kobalt") (collectively, "Appellees") submit that this Court should affirm the district court's decision, dated March 16, 2020 (the "Decision") granting them judgment as a matter of law, under Rule 50(b), on the single copyright infringement claim of Plaintiffs-Appellants Marcus Gray, Emanuel Lambert, and Chike Ojukwu (collectively, "Appellants"). Alternatively, Appellees request that this Court affirm the district court's conditional order granting their motion for a new trial on liability and damages.[1]

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

In this music infringement action pitting the writers of a Christian rap composition entitled "Joyful Noise" against the writers of the hit Katy Perry composition "Dark Horse,"[2] the legal principles of access and substantial similarity are front and center. After the jury issued erroneous verdicts of infringement and

---

[1] Appellants' brief is "OB." Unless noted, all emphasis is added, and all citations and quotation marks omitted.

[2] Appellants do not contend the "Dark Horse" sound recording contains any portion of the "Joyful Noise" sound recording.

damages, the district court issued its thoughtful and comprehensive Decision which properly vacated those verdicts because the trial evidence—largely Appellants' own admissions—could not as a matter of law support the extrinsic test for substantial similarity. While the district court declined to vacate the verdicts based on the lack of evidentiary proof of access, that issue provides an alternative ground for affirmance.

As this Court noted in its seminal decision *Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (*en banc*), it is critical to preserve for music creators the use of the basic building blocks of music, and not allow improper monopolization to form the basis of an infringement claim. This Court recognized that music creators using commonplace elements are entitled to the same breathing room afforded to creators of other art forms. *Id.* at 1069. Thus, in applying the extrinsic test, which "compares the objective similarities of specific expressive elements in the two works … it is essential to distinguish between the protected and unprotected material in a plaintiff's work.'" *Id*. This Court recognized that it is the courts themselves who are the gatekeepers of this function.

Here, the only expression that Appellants allege "Dark Horse" copies is the ostinato in "Joyful Noise" (the "JN Ostinato"), which consists merely of **two**

2

pitches that repeat—a **C and B** note—(four C's followed by two B's)[3] on evenly spaced notes, in a sparse setting, played on a synthesizer. None of these elements are protectable individually or in combination.

In *Skidmore*, this Court held a chromatic scale is a common musical building block that "consists of twelve pitches separated by a half step." 952 F.2d at 1070. "On a piano, this means playing the white and black keys in order from left to right." *Id.* The two pitches C and B (highlighted below,[4] and identified as scale degrees 3 and 2) at issue are simply **two** adjoining white keys on a piano. The use of those two pitches repeated on evenly spaced notes is as simplistic as music creation gets:



As this Court held in *Skidmore*, "[t]hese building blocks belong in the public domain and cannot be exclusively appropriated by any particular author"; "we

---

[3] The musical content of both works was transposed, as the experts agreed, to the key of A minor for purposes of comparison.

[4] This illustration and the chart below (*infra*, p. 32) were demonstratives at trial.

have never extended copyright protection to just a few notes." 952 F.3d at 1069-71. This Court made clear that "'any element from prior works or the public domain are not considered original parts and not protected by copyright'—this is black letter law." *Id*. at 1071 (quoting 17 U.S.C. §§ 102(b), 103). To be protectable, any combination of unprotectable elements must be a "new combination"; a "novel arrangement" with elements "numerous enough and the selection original enough such that it is an original work of authorship." *Id*. at 1074-75.

Recognizing Appellants failed to meet their burden of proving the extrinsic test as a matter of law, the district court properly vacated the erroneous jury verdicts. The Decision is soundly based on the admissions of Appellants and the proper dividing line between commonplace and copyrightable expression.

As the Decision explains, Appellants' expert admitted that none of the individual elements in common between the two compositions are protectable. He also did not refute that Appellees' prior art examples—including one by a "Dark Horse" writer—demonstrate that their purported "combination" of those elements fails to meet the criteria for protectability. In a careful closing of any potential analytical gap, the district court gave Appellants the benefit of the doubt, and considered whether they could possibly have a thin copyright in the JN Ostinato. The district court properly ruled that even if the JN Ostinato is protectable as a thin

copyright, Appellants could not prove infringement thereof because the ostinato in "Dark Horse" was not "virtually identical" to the JN Ostinato and in fact contained numerous differences.

While the Decision based on lack of substantial similarity as a matter of law is unassailable, other grounds exist to affirm it. Appellants proffered wholly insufficient proof for their access theory based on alleged widespread dissemination of "Joyful Noise" via the Internet. This case presents an important issue of first impression as to what constitutes adequate proof of "widespread dissemination" in the massive online repository of the Internet, where billions of works are contained, and which can only be located by the intentional employment of search terms. That is the **antithesis** of widespread dissemination, which contemplates a party coming across a readily available work with far-and-wide reach **without searching**. Appellants have no viable access evidence other than statistics of Internet "views" (not sales) of "Joyful Noise," the numbers of which are undisputedly miniscule **in context** of the bottomless Internet. This proof must be deemed insufficient as a matter of law, otherwise the floodgates will open for claims with grossly inadequate access proof.

For these reasons and others discussed below, this Court should affirm.

5

## COUNTERSTATEMENT OF THE ISSUES

1.      Did the district court correctly rule that Appellees are entitled to judgment as a matter of law under Rule 50(b) because no reasonable jury following the court's proper instructions as to the extrinsic test could conclude that "Dark Horse" was substantially similar to the JN Ostinato in protectable expression?

2.      Are Appellees entitled to judgment as a matter of law on the ground that no reasonable jury following the court's proper instructions as to the intrinsic test could conclude that "Dark Horse" was substantially similar to the JN Ostinato in protectable expression?

3.      Are Appellees entitled to judgment as a matter of law on the ground that no reasonable jury following the court's proper instructions could find that Appellants met their burden of proving that "Joyful Noise" was widely disseminated such that it created a reasonable possibility for any of the Dark Horse Writers to have heard "Joyful Noise"?

4.      Are Appellees entitled to judgment as a matter of law on the ground that no reasonable jury could have concluded that Appellees failed to rebut any showing of copying by proving the independent creation of "Dark Horse"?

5.      Did the district court abuse its discretion by holding in the alternative that Appellees should be entitled to a new trial on liability and damages and that Appellants are not entitled to an award of prejudgment interest?

6

## COUNTERSTATEMENT OF THE CASE

**I.      Appellees And The Creation Of "Dark Horse"**

Perry is a successful recording artist and songwriter.  Her chart-topping recordings, including "Dark Horse," are released by Capitol.  Gottwald (the owner of KMI), Sandberg, Hudson, Walter, and Jordan Houston (p/k/a Juicy J) (collectively, with Perry, the "Dark Horse Writers") are successful songwriters and/or producers, each with a long track record of writing and/or producing popular music.  WC and Kobalt provided certain administrative services in connection with "Dark Horse."  2-SER-390.

Over the course of a day in March 2013 at Conway Studios in Los Angeles, Walter and Gottwald independently created an instrumental musical track (the "Instrumental Track"), which became the musical bed for "Dark Horse."  5-SER-829:10-834:9.  While waiting for an artist, Walter took out his equipment and started playing music.  5-SER-830:4-24.  Walter eventually played a simple downward run of the scale degrees 3-2-1-5.  5-SER-831:24-832:14.  He liked the sound and recorded the Instrumental Track to his music program, Cubase, and looped it, creating the first ostinato in the "Dark Horse" composition ("Ostinato 1").  *Id*.  However, after about 13 seconds, Ostinato 1 started to sound repetitive, so Walter decided to stretch the notes out and slow it down to give it some space for an eventual verse.  5-SER-832:16-834:9.  In doing so, Walter kept his fingers on

7

the same four keys and stretched out Ostinato 1 by adding repetition to the first two scale degrees. *Id.* He repeated the 3 four times, the 2 two times, and again played the 1 and the 5, turning it into 3-3-3-3-2-2-1-5, which became the second ostinato in the "Dark Horse" composition ("Ostinato 2"). *Id.* Walter added drum sounds, inserted Ostinato 1 into the chorus, and made some additional modifications. 5-SER-834:10-22.

Later that day, Gottwald joined Walter at Conway Studios and made further modifications, including adding underlying bass notes to give the Instrumental Track more depth. 5-SER-834:23-835:17; 5-SER-898:10-899:18.

A couple of months later, Walter and Gottwald met Perry in Santa Barbara in connection with the recording of her forthcoming album, *Prism*. 2-ER-323:23-324:14; 5-SER-837:11-839:11; 5-SER-901:9-15. Among other instrumental tracks, Walter and Gottwald played the Instrumental Track for Perry, who liked it and decided to use it as the basis for a song. *Id.*; 5-SER-838:19-839:11. Over the summer of 2013, Perry, Hudson, and Sandberg created the vocal melody and lyrics for "Dark Horse" in collaboration with Gottwald and Walter. 2-ER-324:15-325:9; 4-SER-757:18-758:5; 5-SER-839:15-841:8; 5-SER-901:16-902:5. Later, Houston wrote and recorded the rap vocal portion of "Dark Horse." 3-SER-527:4-11; 4-SER-760:6-24. All the elements were mixed together, and Ostinato 1 and Ostinato 2 remained the same throughout as created by Walter and Gottwald. 4-SER-

8

761:18-762:4; 5-SER-789:4-790:15; 5-SER-841:2-842:3; 5-SER-901:6-903:4; 5-SER-970:23-971:22.  "Dark Horse" was released in September and October 2013 as a single and on Perry's album, *Prism*.

## II.     Appellants And The Creation Of "Joyful Noise"

Appellants are Christian hip-hop artists who concededly operate in a "far different musical universe" than the pop-music Dark Horse Writers.  1-SER-138.

In 2007, using a free music website, Ojukwu recorded a very simple "beat." 3-SER-547:13-548:1; 3-SER-554:19-555:3; 3-SER-576:19-577:7.  Ojukwu advertised his beats on his Myspace page, and he sold this simple beat with another one to Gray for $300.  3-SER-558:19-559:23.  Later, Gray used Ojukwu's beat as the musical bed of "Joyful Noise," in which the JN Ostinato appears.  3-SER-558:1-18.

Gray, Lambert, and non-party Lecrae Moore contributed to "Joyful Noise," a recording of which appeared on Gray's 2008 album, *Our World Redeemed*.  1-SER-141-42.  Only **after** the release of "Dark Horse" did Appellants claim joint authorship of, and obtain from the United States Copyright Office a registration for, "Joyful Noise."  *Id*.

## III.    Appellants' Expert's Admissions Demonstrated There Was No Substantial Similarity As A Matter of Law

Appellants proffered the expert testimony of musicologist Dr. Todd Decker who testified there are "five or six" purported similarities between the JN Ostinato

9

and one of the two ostinatos in "Dark Horse"— Ostinato 2. *Infra*, p. 31. Decker testified that the core similarity between the JN Ostinato and Ostinato 2 is the scale degree sequence 3-3-3-3-2-2 on an even (*i.e.*, unsyncopated) rhythm. *Infra*, pp. 31-32. However, as detailed below, Decker conceded these similarities individually are not protectable, and he also failed to rebut that the combination of 3-3-3-3-2-2 on even notes appears in numerous prior compositions. *Infra*, pp. 32-36, 41-42. He also conceded the JN Ostinato and Ostinato 2 in "Dark Horse" contain many differences. *Infra*, pp. 44-46.

IV.     **Appellants' Evidence Was Insufficient To Prove Access**

A.     **Appellants Did Not Prove "Joyful Noise" Was Widely Disseminated Prior To The Creation Of "Dark Horse"**

Appellants conceded they had no direct evidence of Appellees' access to "Joyful Noise" or a chain of events linking "Joyful Noise" to Appellees. 6-SER-1199:7-14; 6-SER-1201:7-13. Appellants admitted they never met, spoke to, or communicated with any Dark Horse Writer and never sent any music to them directly or through an intermediary. 3-SER-495:12-498:9; 3-SER-581:19-583:19; 4-SER-671:9-672:24. Appellants also admitted they had no knowledge of any Dark Horse Writer hearing "Joyful Noise" (*id.*), and each Dark Horse Writer — without contradiction—denied ever hearing it. 3-SER-532:1-12; 5-SER-790:16-793:19; 5-SER-822:7-21; 5-SER-842:22-845:2; 5-SER-876:22-879:21; 5-SER-972:11-975:23. The Dark Horse Writers other than Perry never listened to

10

Christian hip-hop or any form of Christian music, and Perry has not listened to Christian music since 2001. *Id.*; 3-SER-535:20-536:6. Appellants' allegation of access was merely that "Joyful Noise" was so widely disseminated that Walter or Gottwald[5] had a reasonable opportunity to hear it prior to creating Ostinato 2. Appellants' proof was woefully insufficient.

The trial record was devoid of any evidence of any commercial exploitation of *Our World Redeemed* or "Joyful Noise":

- **Sales**: Appellants did not offer proof of one single digital or brick-and-mortar sale of "Joyful Noise" or *Our World Redeemed* and admitted they had no such evidence. 3-SER-498:22-499:8; 4-SER-688:2-5; 5-SER-931:10-15.

- **Radio/TV**: There was no evidence that "Joyful Noise" received any radio or television play; Gray offered speculation that a "snippet" played **in the background** of interviews at unknown stations, at unknown times, to an unknown audience. 3-SER-622:3-623:10.

- **Performances**: There was no documentary evidence that Gray (or Moore) performed "Joyful Noise" at large concerts attended by large crowds, or at any specific venue at all. Gray and/or Moore performed the song, at most,

---

[5] Appellants conceded that only Walter and Gottwald created Ostinato 2 and are relevant to access. 6-SER-1202:5-9.

about 300 times over several years at unknown venues to audiences of unknown size, with 70 percent at churches and other religious venues (4-SER-683:16-18; 5-SER-918:7-11; 5-SER-938:10-13) and a good portion of the rest at religious-themed events. 4-SER-740:17-742:8. Lambert himself only attended a few performances of "Joyful Noise," at only Christian venues. 3-SER-502:9-17. Appellants presented no set lists or tapes of any performances.

- **Critical Acclaim**: Appellants had no evidence of critical claim or mention beyond references on Christian and gospel Billboard charts and no music award nominations beyond Christian or gospel categories.[6]

Faced with no traditional commercial distribution evidence, Appellants offered (1) the cumulative "view" counts of six videos of "Joyful Noise" available on YouTube between 2008 and 2012, and (2) the cumulative "play" counts of "Joyful Noise" on Myspace profile pages for Gray and Moore during those same five years. 1-SER-169-71; 1-SER-173-74.

While Appellants' counsel **argued** these view counts proved widespread dissemination because "6 million is a big number" (6-SER-1203:19), argument is not evidence. Appellants offered no evidence to meet their burden to prove the

---

[6] The district court properly held and instructed the jury that Billboard charts are not evidence of sales. 1-SER-101; 4-SER-649:5-7; 4-SER-649:15-18.

view counts indeed constituted widespread dissemination **in the context of those internet platforms**.

Appellees presented **unrebutted** evidence of the sheer magnitude of information available on, and functionality features of, YouTube and Myspace, which relegated Appellants' "view" and "play" counts to miniscule numbers in that context. A cumulative few million "views" or "plays" on those platforms over a period of several years is a drop in the bucket compared, as they must be, to the **trillions** of views/plays on those services in the same timeframe. *Infra*, pp. 53-59.

**B. <u>The Evidence Showed Appellees Did Not Avail Themselves Of The Opportunity To Hear "Joyful Noise"</u>**

In addition to testifying that they never heard of Appellants or their music, and never heard "Joyful Noise," Walter and Gottwald also provided unrebutted and unimpeached testimony that:

- They did not search the Internet to discover new music unknown to them, did not search for Christian music, and never came across "Joyful Noise" in their Internet searches. 5-SER-845:3-846:10; 5-SER-865:18-866:2.

- They did not know Gray or Moore and never attended one of their concerts or those of religious music; and did not listen to religious music, including Christian hip-hop. 5-SER-842:22-845:2; 5-SER-846:5-10; 5-SER-876:22-879:24.

13

- They barely paid attention to Billboard charts and Grammy nominations except when they pertained to their music genre, and their careers—*i.e.*, the pop categories.  5-SER-811:2-13; 5-SER-846:14-847:16; 5-SER-881:25-884:6; 5-SER-890:17-19.  This testimony was not contradicted or impeached.[7]

## V.    The Trial Evidence Does Not Support The Jury's Damages Award

As the Decision reflects, the jury arbitrarily and erroneously concluded that 22.5% percent of the net profit earned by each Appellee from "Dark Horse" was "attributable to the use of the 'Joyful Noise' musical composition in Ostinato 2 in 'Dark Horse' as opposed to other factors."  3-ER-373.  This speculative percentage had no evidentiary foundation tied to any proper apportionment analysis.

First, Appellees offered the testimony of Dr. Lawrence Ferrara who opined that Ostinato 2 was of minimal value to "Dark Horse," both qualitatively and quantitatively as a musicological matter.  7-SER-1465:6-1475:1.  Ferrara concluded that Ostinato 2 comprises 7.2% of the total note heads of "Dark Horse" and that because the lyrics of "Dark Horse" (50% of its value) are not at issue, the 7.2% total must be reduced to a value of 3.6%.  7-SER-1472:10-1473:16.

---

[7] The other Dark Horse Writers' testimony was in accord.  2-ER-314:5-315:14; 3-SER-532:1-533:5; 3-SER-534:20-535:9; 5-SER-788:19-789:3; 5-SER-794:12-797:2; 5-SER-969:12-21; 5-SER-975:2-977:11.

14

As a qualitative measurement, Ferrara testified that because Ostinato 2 is **not** part of the hook (i.e., the most memorable part) of "Dark Horse," this further reduced the value of Ostinato 2 to below 3.6%. 7-SER-1464:23-1475:1.[8]

Second, Appellees offered the unrebutted testimony of Dr. Jason King, who testified as to the myriad of other, far more important, factors than Ostinato 2 that drove the commercial success of "Dark Horse." He explained the primary drivers of its commercial success were the celebrity brands and star power of Perry and Houston, as well as Capitol's significant marketing efforts that drove sales and exposure. 2-ER-54:9-56:16. King testified that certain key secondary factors were more important than Ostinato 2, including the core "hook" chorus (which did not contain Ostinato 2), Perry and Houston's vocal performances, other instrumental musical elements taken together, and the overall production/arrangement. 2-ER-62:11-67:17. King also identified certain "tertiary factors," which included the lyrics and individual musical elements, including Ostinato 2. 2-ER-67:8-69:17. King testified that, **on its own**, Ostinato 2 had "relatively insignificant value" and that "nobody bought 'Dark Horse' simply because of Ostinato No. 2 alone." 2-ER-68:7-18. He elaborated that Ostinato 2 could have been replaced with any number

---

[8] Appellants did not provide any reliable expert testimony to rebut or refute Ferrara's apportionment opinions, and instead merely proffered an observation by Decker that Ostinato 2 is purportedly audible during approximately 45% of the playing time of the audio recording of "Dark Horse."

15

of similarly commonplace "trap" synth parts and it would not have changed "Dark Horse's" success. 2-ER-68:2-69:18.[9]

Perry's celebrity brand and star power and the massive marketing efforts of Capitol were also the core primary factors that drove the success of *Prism*, which contained "Dark Horse" as one of many other tracks, including other hit singles: "Roar" (the lead single), "Walking On Air," "Unconditionally," "Birthday," and "This Is How We Do." 2-ER-69:18-74:23. King testified that if consumers "just wanted the single [as opposed to the entire album], they would just buy the single." 2-ER-70:3-14. "Dark Horse" as a whole (not just Ostinato 2) was a secondary factor to the success of *Prism*. Because "Ostinato 2 is just one element of "Dark Horse," its value was even more insignificant. 2-ER-74:24-75:15.

Appellants did not present any apportionment evidence to rebut King.[10]

## VI.     The District Court's Decision

Trial was bifurcated into liability and damages phases. At the close of each phase, Appellees moved under Rule 50(a) for judgment as a matter of law. 3-ER-603-605. The district court took those motions under advisement and sent the case to the jury after both phases. *Id.* The jury returned a liability verdict in favor of Appellants, and awarded $2.8 million in damages. 1-ER-2. Appellees made a

---

[9] "Trap" is a subgenre of rap/hip-hop music. 2-ER-66:5-12.

[10] Appellants also did not submit evidence to rebut Capitol's evidence concerning its overhead costs. *Infra*, p. 65 n.34.

16

renewed motion for judgment as a matter of law under Rule 50(b), or alternatively, for a new trial under Rule 59. *Id.* Appellants also made a motion for prejudgment interest, which was heard concurrently. *Id.*

**A.      The District Court's Rulings Regarding The Lack Of Substantial Similarity Between "Joyful Noise" And "Dark Horse"**

In its meticulous thirty-two page Decision, the district court properly vacated the jury verdicts and granted Appellees' renewed motion for judgment as a matter of law, on the ground that Appellants failed to prove that the extrinsic test supported their claim of infringement.  Substantial similarity could not be, and was not, proven by Appellants because (1) none of the individual musical elements of the JN Ostinato that allegedly were infringed were protectable under copyright **based on Appellants' expert's own admissions**; (2) neither the "combination" or selection and arrangement of those individual elements constituted copyrightable expression **based on Appellants' expert's admissions and undisputed prior art**, and (3) even if the JN Ostinato itself were protectable, it would be a "thin copyright" at best, and Ostinato 2 does not infringe it as it is not virtually identical to the JN Ostinato as a matter of undisputed fact.  1-ER-8-24.

The court held the individual elements of the JN Ostinato allegedly infringed were "precisely the kinds of commonplace elements that courts have routinely denied copyright protection … as a matter of law."  1-ER-13.  The court further held that the way in which those individual elements are combined does not make

17

the JN Ostinato protectable. 1-ER-20-22. As explained in *Skidmore*, a protectable "combination" "cannot mean any 'set' of artistic building blocks." 952 F.3d at 1075. Rather, it is "only the new combination that is the 'novel arrangement,' … and not 'any combination of unprotectable elements ... [that] qualifies for copyright protection.'" *Id.* Here, the assemblage of a small number of admittedly unprotectable elements does not come close to constituting a "novel arrangement." Accordingly, the court held the combination in common between the JN Ostinato and Ostinato 2 is not protectable as a matter of law. As the court correctly recognized, "it is not a particularly unique or rare combination, even in its deployment as an ostinato." 1-ER-20.

The court also properly held that Appellants' infringement claim would fail as a matter of law even if, *arguendo*, the JN Ostinato itself was novel since such combination only would qualify for "thin copyright" protection. As such, Appellees' Ostinato 2 would have to be "virtually identical" to be substantially similar. 1-ER-22. The court pointed to significant differences—that Appellants **admitted**—between the two ostinatos and concluded that the evidence presented at trial precludes them from being found to be "virtually identical." 1-ER-23.

In the alternative, the district court held that Appellees are entitled to a new trial because the jury's finding of substantial similarity under the extrinsic test is against the clear weight of the evidence. 1-ER-22; 1-ER-24.

18

### B. The District Court's Rulings Regarding Damages

The district court held that if it had not awarded judgment in Appellees' favor on liability, it would have ordered a new trial on damages unless Appellants accepted a remittitur: "The jury's damage award in this case – which disregarded powerful testimony [by King] that it was Katy Perry's star power and Capitol Records' marketing efforts (not plaintiffs' ostinato) that generated 'Dark Horse's' commercial success . . . seems clearly against the weight of the evidence presented at trial, even if otherwise based on substantial evidence offered by the plaintiffs." 1-ER-31.

### C. The District Court's Rulings Regarding Other Issues Raised By Appellees

The court did not disturb the jury verdict on the alternative grounds presented by Appellees. However, Appellees submit that, as a matter of law: (i) Appellants failed to prove access; (ii) Appellees established the independent creation of "Dark Horse"; and (iii) Appellants failed to prove intrinsic similarity.

### D. The District Court's Rulings Regarding Prejudgment Interest

The court denied Appellants' motion for prejudgment interest as moot, but correctly noted that if the jury's verdict remained, the motion would have been denied because "[f]ully litigating the dispute through trial was … 'not needless delay.'" 1-ER-32.

19

**STANDARD OF REVIEW**

I.      **Rule 50(b) Motion For Judgment As A Matter Of Law**

This Court reviews *de novo* a district court's ruling on a Rule 50(b) motion for judgment as a matter of law.  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (abrogated on other grounds).  The Court may affirm "on any grounds supported by the record."  *Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1143 (9th Cir. 2003).  A district court's decision should be affirmed where "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Josephs v. Pac. Bell,* 443 F.3d 1050, 1062 (9th Cir. 2006).

Judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (same); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986) (relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

On a Rule 50 motion, the court does not consider what the jury actually found, but whether a sufficient evidentiary basis supported finding for the

20

nonmoving party. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012) ("Only the sufficiency of the evidence matters; what the jury actually found is irrelevant."). Judgment as a matter of law is not limited to situations where "there is a complete absence of probative facts to support a jury verdict." *In re Letterman Bros. Energy Sec. Lit.*, 799 F.2d 967, 972 (5th Cir. 1986). Indeed, a "mere scintilla" of evidence is not enough to sustain a verdict for the prevailing party. *Id.* at 971; *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 545 (7th Cir. 1997). While courts "draw all reasonable inferences in [the non-movant's] favor," a reasonable inference "cannot be supported by only threadbare conclusory statements instead of **significant probative evidence**." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009); *see also Genthe v. Lincoln*, 383 F.3d 713, 716 (8th Cir. 2004) (an inference is reasonable "when it may be drawn from the evidence without resort to speculation").

Judgment as a matter of law is also appropriate where the jury disregarded the evidence and jury instructions at trial, or where "the jury could have relied only on speculation to reach its verdict." *Lakeside-Scott*, 556 F.3d at 803; *Home Design Servs, Inc. v. Turner Heritage Homes, Inc.*, 101 F.Supp.3d 1201, 1215 (N.D. Fla. 2015); *Mag Jewelry Co., Inc. v. Cherokee, Inc.*, 496 F.3d 108, 119 (1st Cir. 2007). Moreover, "unimpeached and uncontradicted evidence favorable to the movant [] can be considered by [the court] in evaluating the merits" of a motion for judgment

21

as a matter of law. *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1314 (2d Cir. 1990).

Under these standards, the district court properly granted Appellees judgment as a matter of law. *See, e.g.*, *Lillie v. ManTech Int'l Corp.*, 837 F.App'x 455 (9th Cir. 2020).

## II. Rule 59 New Trial Standard

Under Rule 59, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Those reasons include "if the verdict is contrary to the clear weight of the evidence …." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) or if "the jury has reached a seriously erroneous result." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014). The "district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014); Fed. R. Civ. P. 59(d).

"Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict." *Experience Hendrix*, 762 F.3d at 842. The court has "the duty … to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the

22

court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729. The court "can weigh the evidence, make credibility determinations, and grant a new trial for any reason necessary to prevent a miscarriage of justice." *Experience Hendrix*, 762 F.3d at 841. Moreover, "cumulative error in a civil trial may suffice to warrant a new trial even if each error standing alone may not be prejudicial." *Jerden v. Amstutz*, 430 F.3d 1231, 1241 (9th Cir. 2005).

If, on a motion for a new trial, the court decides the jury's damages award is excessive, the district court may grant a new trial. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983). This Court reviews the district court's determination of these matters for an abuse of discretion. *Experience Hendrix*, 762 F.3d at 841. This Court similarly reviews a district court's decision on an award of prejudgment interest for an abuse of discretion. *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013).

## ARGUMENT

### I.     General Copyright Infringement Standards

"Proof of copyright infringement requires [Appellants] to show: (1) that

[Appellants] own[] a valid copyright in ["Joyful Noise"][11]; and (2) that [Appellees]

copied protected aspects of the work." *Skidmore*, 952 F.3d at 1064.

"The second prong of the infringement analysis contains two separate

components: 'copying' and 'unlawful appropriation.'" *Skidmore*, 952 F.3d at

1064. "Although these requirements are too often referred to in shorthand lingo as

the need to prove 'substantial similarity,' they are distinct concepts." *Id.* "Because

independent creation is a complete defense to copyright infringement, a plaintiff

must prove that a defendant copied the work." *Id.* "In the absence of direct

evidence of copying, which is the case here, the plaintiff 'can attempt to prove it

---

[11] Appellants failed to establish their ownership of a valid copyright registration in the JN Ostinato. "Joyful Noise" is not a joint work (as their registration claims), but a **derivative work** incorporating Ojukwu's pre-existing ostinato. As such, Appellants' "Joyful Noise" copyright registration does not encompass the JN Ostinato, which is the only music in "Joyful Noise" at issue, and Appellants have no standing to sue for its infringement. 17 U.S.C. §§ 103, 411(a). Ojukwu created the JN Ostinato as a standalone work, which Gray purchased and incorporated into "Joyful Noise" without Ojukwu's participation or control. 3-SER-573:3-12; 4-SER-693:4-9; 3-SER-574:1-10; 3-SER-573:3-12; 3-SER-577:16-25; 3-SER-579:2-16. This does not create a joint work. *Moi v. Chihuly Studio, Inc.*, -- F.App'x --, 2021 WL 777781, at *1 (9th Cir. Mar. 1, 2021). The district court incorrectly concluded Appellants established joint ownership of "Joyful Noise" by entering into a contract—long after its creation—which purported to acknowledge all Appellants as joint authors. An *ex post facto* contract cannot create a joint work. *Marya v. Warner/Chappell Music, Inc.*, 131 F.Supp.3d 975, 994 (C.D. Cal. 2015).

24

circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying.'" *Id.*

"On the other hand, the hallmark of 'unlawful appropriation' is that the works share *substantial* similarities." *Skidmore*, 952 F.3d at 1064 (emphasis in original). The Ninth Circuit applies "a two-part test to determine whether the defendant's work is substantially similar to the plaintiff's copyrighted work." *Id.* "The first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works." *Id.* "Crucially, because only substantial similarity in protectable expression may constitute actionable copying that results in infringement liability, it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Id.* "The second part, the intrinsic test, 'test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance.'" *Id.* "Both tests must be satisfied for the works to be deemed substantially similar." *Id.*

Because Appellants lacked any direct evidence of copying, Appellants had the burden to prove, *inter alia*, that Appellees had (1) access to "Joyful Noise" and (2) that "Joyful Noise" and "Dark Horse" are substantially similar in protected expression. Appellants failed to meet their burden as to either element.

25

**II.    The District Court Properly Granted Appellees Judgment As A Matter Of Law On The Dispositive Issue Of Substantial Similarity**

**A.    Copyright Law Does Not Protect Commonplace Expression**

Copyright law does not provide copyright owners with all-encompassing monopoly rights so as to deter future authors from creating original works of their own. Instead, the goal is to promote the creation and "public availability of literature, music, and the other arts." *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 432 (1984).

Preventing copyright claimants from monopolizing commonplace expression is critical to accomplishing the Copyright Act's goal of encouraging the creation of new artistic works. *Skidmore*, 952 F.3d at 1069 ("Authors borrow from predecessors' works to create new ones, so giving exclusive rights to the first author who incorporated an idea, concept, or common element would frustrate the purpose of the copyright law and curtail the creation of new works"). This is because "in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994).

Copyright owners thus do not have exclusive rights over each and every element of their copyrighted works. *Feist Publ'n, Inc. v. Rural Telephone Serv.*

26

*Co. Inc.*, 499 U.S. 340, 348 (1991). Rather, "expressions that are standard, stock or common to a particular subject matter or medium are not protectable under copyright law." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003). When an author creates a work incorporating commonplace "elements [which] are already in the public domain," that author is entitled to "receive protection only for [her or] his original additions to the" new work. *Stewart v. Abend*, 495 U.S. 207, 234 (1990).

Musical compositions are no exception to this rule; they are entitled to the same scope of protection as any other creative work. *Smith v. Jackson*, 84 F.3d 1213, 1216 n.3 (9th Cir. 1996) ("common or trite" musical elements not protected). As explained in *Newton v. Diamond*, "[t]he principle that trivial copying does not constitute actionable infringement has long been a part of copyright law." 388 F.3d 1189, 1193 (9th Cir. 2004).[12]

### 1. The Extrinsic Test Requires Dissection And Extraction Of Unprotectable Elements

In conducting the substantial similarity analysis, the trier of fact must first apply the extrinsic test. As the district court recognized in its jury instructions, this

---

[12] Appellants incorrectly argue that an "additional standard" applies to Rule 50 extrinsic similarity decisions. OB at 23. All Rule 50 motions are governed by the same standard. And unlike in the substantial similarity analysis in the cases relied on by Appellants, the Decision was not the result of a "battle of the experts" or factual interpretation. Rather, it was based on Decker's numerous admissions at trial, which established that substantial similarity was lacking as a matter of law.

test "requires breaking the [plaintiff's and defendant's] works down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004); 3-ER-428. "Because the requirement is one of substantial similarity to **protected** elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material" and extract the unprotected material before comparing the two works. *Swirsky*, 376 F.3d at 845 (emphasis in original).

In music copyright cases, this discerning and critical test must be applied prior to assessing substantial similarity. *Skidmore*, 952 F.3d at 1070. Courts act as **gatekeepers** to ensure this essential test is met because there are a "limited number of notes and chords available to composers and … common themes frequently reappear in various compositions, especially in popular music." *Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988). If such commonplace musical devices are accorded copyright protection, then "future authors, composers and artists will find a diminished store of ideas on which to build their works." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1225 (11th Cir. 2008).

> **2. A Combination Of Commonplace Elements Is Only Protectable If Those Elements Are Sufficiently Numerous And Their Selection And Arrangement Is Sufficiently Original**

Courts apply a further series of limiting doctrines to ensure that claims of infringement of combinations of unprotectable expression do not stifle other

creators. Thus, as the district court recognized in its jury instructions, a combination of unprotectable musical elements may only be potentially subject to copyright protection if "those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava*, 323 F.3d at 811; 3-ER-425. As *Skidmore* articulated, a protectable "combination" "cannot mean any 'set' of artistic building blocks." 952 F.3d at 1074. Rather, it is "only the **new** combination, that is the '**novel** arrangement,' … and not '**any** combination of unprotectable elements ... [that] qualifies for copyright protection.'" *Id*. (emphasis in original).

### 3. A Combination Of A Few Commonplace Elements Has A Narow Range Of Expression Entitled Only To A "Thin Copyright"

As the district court recognized in its jury instructions (3-ER-425), even if a combination of commonplace elements is entitled to protection, it receives, at most, a "thin copyright that protects against only virtually identical copying." *Satava*, 323 F.3d at 812. The Ninth Circuit has routinely applied this "thin" copyright standard in cases involving artistic works where the claimed similarity is the selection and arrangement of a limited number of elements. *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 776 (9th Cir. 2018) (thin copyright pen-and-ink drawing); *Satava*, 323 F.3d at 812 (thin copyright in sculpture); *Frybarger v. Int'l Bus. Machines Corp.*, 812 F.2d 525, 530 (9th Cir. 1987) (thin copyright in video game).

29

**B.    The District Court Properly Applied The Extrinsic Test And Correctly Granted Appellees Judgment As A Matter of Law**

Appellants claimed that the only portion of the musical composition "Joyful Noise" that was infringed was its ostinato, and the only portion of "Dark Horse" which Appellants claimed to be infringing was Ostinato 2.[13]  7-SER-1357:24-1358:3.

In its Decision, the district court properly articulated the governing legal standards and applied them to the trial testimony **admissions** of Decker, which inexorably led to three dispositive conclusions.  **First**, all of Appellants' claimed similarities between "Dark Horse" and "Joyful Noise" are commonplace; accordingly, these elements are not individually protectable.  **Second**, the JN Ostinato does not contain a sufficiently original selection, arrangement, and coordination of numerous enough commonplace elements to warrant copyright protection as a combination of otherwise unprotectable elements.  **Third**, even if, *arguendo*, the "Joyful Noise" combination of unprotectable elements was protectable, it would only be entitled to a "thin copyright," which only prohibits "virtually identical" copying.  Ostinato 2 in "Dark Horse" and the JN Ostinato are

---

[13] The first 18 seconds of "Dark Horse" were referred to by Ferrara as Ostinato 1, and the following ostinato in "Dark Horse" as Ostinato 2.  Appellants did not claim that Ostinato 1 infringed "Joyful Noise."  Even though Ostinato 1 begins "Dark Horse" and is in each chorus, Appellants erroneously claim that Ostinato 1 should be referred to only as the "introduction."  OB at 12 n.8.  That does not change the undisputed facts as to which portion of "Dark Horse" is at issue.

not "virtually identical," but instead contain numerous differences, and thus no substantial similarity can be found.[14]

The district court properly granted judgment as a matter of law to Appellees on the extrinsic test. *Benay v. Warner Bros. Entm't*, 607 F.3d 620, 624 (9th Cir. 2010) (substantial similarity "may often be decided as a matter of law").

### 1. The District Court Correctly Held That, Based On Appellants' Expert's Own Admissions, The Claimed Similarities Are Not Individually Protectable

The district court relied upon Decker's delineation of "five or six" similarities between "Joyful Noise" and "Dark Horse":

> [1] The length of the ostinato is similar, eight notes. [2] The rhythm of the ostinato is similar. [3] The melodic content, the scale degrees present [are similar]. [4] The melodic shape … the way the melody moves through musical space [is similar]. [5]… [T]he timbre or the quality and color of the sound is similar, and [6] … the placement of this material, this ostinato, in the musical space of the recording in the mix, that is also similar. **So that's five or six points of similarity between the two ostinatos**."

---

[14] Appellants argue the district court's "thin copyright" instruction was improper, and given over Appellants' objection. OB at 20 n.11, 48 n.16. However, Appellants repeatedly embraced the instructions, which were proper in any event. *E.g.*, 1-SER-16 ("The jury was properly instructed" regarding substantial similarity); 1-SER-17 (thin copyright instruction was merely "perhaps improper[]"). Appellants thereby waived any objection. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1108 (9th Cir. 2001). Thus, if this Court reviews that instruction, it will be *de novo* for plain error. *Chess v. Dovey*, 790 F.3d 961, 970 (9th Cir. 2015).

1-ER-10.[15] Decker used the following chart of pitch sequences to summarize the purported similarities:

| Beat | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|------|---|---|---|---|---|---|---|---|
| Joyful Noise | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}/\hat{6}$ |
| Dark Horse | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{3}$ | $\hat{2}$ | $\hat{2}$ | $\hat{1}$ | $\hat{5}$ |

2-ER-219:16-220:13.

The Decision outlined Decker's concessions that each of these similarities was individually commonplace and unremarkable, admitting that "[a]ny single one of those would not have been enough." 1-ER-11-12. Decker claimed instead that Appellants relied on a combination of unprotectable expression: "[i]t's the combination of them …." *Id.*

Despite Decker's identification of "five or six" similar elements, in their post-trial briefing, Appellants claimed that there are nine purported similarities, and now on appeal argue that there are eight. OB at 15-16. Simply using different organization and ways of describing the same similarities identified by Decker does not alter Decker's testimony of five or six, which controls. In any event, as

---

[15] Appellants comment that the district court denied Appellees' motion for summary judgment. OB at 3, 5. But "denial of a motion for summary judgment does not mandate that a Rule 50 motion be denied, because the latter tests the sufficiency of evidence actually presented at trial." *Archibald v. Cty. of San Bernardino*, 2018 WL 6017032, at *4 n.3 (C.D. Cal. Oct. 2, 2018). At trial, Decker made critical admissions beyond those in the summary judgment record.

the district court properly held: "whether these elements are five, six, or nine in number, none of them individually can be accorded copyright protection as a matter of law." 1-ER-11. Indeed,

> The clear-indeed, only-implication of Dr. Decker's testimony is that, if the two ostinatos are similar at all, it is reasonable only as a result of the arrangement of elements within those ostinatos, not any similarities between the individual elements themselves (which "would not have been enough"). **Plaintiffs' burden to present evidence that establishes the protectability of each individual element is not met when their own expert provides testimony that assumes the opposite.**

1-ER-12.

Decker further admitted the commonplace nature of **each** of the individual similarities at issue:

1. **Eight-Note Ostinato.** Decker acknowledged that the use of an ostinato itself is not protectable, in that "countless" musical works have contained ostinatos. 2-ER-285:14-286:7. With respect to the purported shared phrase length of eight notes, Decker admitted that "[i]t's characteristic for a phrase like this to last for eight beats."[16] 2-ER-227:3-11.

---

[16] The JN Ostinato actually consists of 16 beats. 2-ER-171:16-172:13.

33

**2.** **Rhythm.** Decker admitted evenly spaced notes are not protectable because they are a "relatively simple rhythmic choice" that "no composer's entitled to monopolize." 2-ER-286:12-23; 2-ER-295:18-20.[17]

**3.** **Scale Degrees "3-3-3-3-2-2."** With respect to the main similarity asserted by Decker of scale degrees "3-3-3-3-2-2" (or "C-C-C-C-B-B") in a minor mode, Decker made numerous critical admissions establishing that this pitch sequence is not protectable. These include:

- The minor mode is common. 1-SER-22.[18]

- Scale degree 3 in the minor mode informs the listener that a song is "in the minor mode." 2-ER-229:13-14.

- "[S]cale degrees have … tendencies" in that they "want to go places." 2-ER-222:24-223:14; 2-ER-229:18-23. Specifically, "3 wants to go down to 2" and "2 desperately wants to go to 1" because "1 is our home note." 2-ER-229:19-22; 2-ER-237:6-7; 2-ER-237:18-21; 2-ER-238:1-6.

---

[17] Contrary to Appellants' assertion, Decker never testified that the rhythm of "Joyful Noise" is comprised of eighth notes. He testified he could not determine whether the even rhythm was half, quarter, or eighth notes. 2-ER-287:6-288:1.

[18] As the district court recognized, the use of the minor mode is not protectable, "given the limited number of scales that exist." 1-ER-21; *see also Skidmore*, 952 F.3d at 1070 ("musical concepts like the minor chromatic line and the associated chords have been 'used in music for quite a long time' as 'building blocks'"); *Gaste*, 863 F.2d at 1068.

34

- A "C" note and a "B" note are two white keys next to each other on a piano, these notes are not hard to play, and it is relatively simple to hit four "C" notes in a row followed by two "B" notes. 2-ER-273:1-7; 2-ER-295:1-14.

- The children's song "Merrily We Roll Along" (found in a beginning instructional book for elementary students) and the Christmas carol "Jolly Old St. Nicholas" also contain the pitch sequence 3-3-3-3-2-2 on evenly spaced notes. 2-ER-157:7-158:17; 2-ER-160:17-161:4. Decker did not dispute this, and it is unrebutted.

**4. Melodic Shape.** The district court explained why **Decker's own admissions** establish that the purported "melodic shape" of the ostinatos—a descent in scale degrees from 3 to 2 to 1—is not protectable:

> … [W]ith respect to the way the "Joyful Noise" ostinato resolves from 3 to 2 to 1, Decker testified that "scale degrees have tendencies" in popular music such that, to make a pleasant consonant sound, "3 wants to go down to 2" and "2 desperately wants to go to 1" because "1 is our home note," which indicates that the way the ostinato resolves is not so much original as it is necessary, *id*. at 443:24-444:14, 450:18-22 ….

1-ER-12.

Decker further admitted Ostinato 1 in "Dark Horse," which he conceded is not infringing, contains this same descent from 3 to 2 to 1. 2-ER-275:8-276:6. As Decker conceded, repeating scale degree 3 is a technique composers use to "build[] up tension that wants to be released and it's released to two", (2-ER-230:22-23);

35

"you repeat [scale degree 3] more often and it creates more of a desire for it to go down" (2-ER-229:21-22).

Decker also did not dispute that "Love Me Or Hate Me," released prior to "Joyful Noise" in 2006 and co-written by Gottwald, contains a descending ostinato with a "3-2-1-5" pitch content, evenly spaced notes, and a sparse texture. 2-ER-166:8-167:11. Nor did Decker dispute that third-party works "Brainchild," released in 1996, and "Choosing Life," released in 2002 (prior to "Joyful Noise"), also contain the repeating scale degrees ("3-2-1-5" or "C-B-A-E") that are present in both Ostinato 1 and Ostinato 2 in "Dark Horse." 2-ER-137:8-20; 2-ER-139:12-24.

**5.** **Timbre.** While Decker testified that the "t[imbre] or the quality and color of the sound" is similar (2-ER-224:24-225:2), in that both works are produced in a sound recording using a "pingy sound" with a synthesizer, (2-ER-231:21-232:19) he conceded the timbre of the musical compositions are "not identical" (id.), and that a pingy synthesized timbre cannot be monopolized (2-ER-295:21-296:4).

**6.** **Texture.** Although Decker contended both "Joyful Noise" and "Dark Horse" purportedly have a "sparse" texture, unrebutted testimony from Ferrara established that sparse texture is commonplace. 2-ER-165:15-166:7.

36

These admissions establish as a matter of law the unprotectable nature of each of the musical elements identified by Decker as the purported basis of Appellants' claim. Unable to rebut the same, Appellants rely on Decker's testimony describing these similarities in vague and meaningless terms such as "distinctive," "significant," "noteworthy," and "kind of cool." OB at 28-30, 39-40, 42. Such testimony does not erase his specific admissions, or render the commonplace elements protectable.

Based on the record discussed above, the district court correctly held that it "cannot conclude, pursuant to the extrinsic test, that any of the allegedly original individual elements of the 'Joyful Noise' Ostinato are independently protectable as a matter of law." 1-ER-15. Accordingly, **all** of the claimed individual similarities between the JN Ostinato and Ostinato 2 must be extracted and filtered out. *Swirsky*, 376 F.3d at 845. As discussed below, all that remains are undisputed differences.

To distract from the dispositive admissions, Appellants make three unavailing arguments. **First,** Appellants argue that "the district court erroneously asserted that 'a pitch sequence . . . is not entitled to copyright protection.'"[19] OB at

---

[19] Appellants attempt to support this argument by improperly inserting into their OB purported transcriptions of works by Beethoven and the Rolling Stones that were not part of the record below. OB at 33-34. Appellees have filed a motion (which remains *sub judice*) to strike the purported transcriptions and Appellants' discussion. Dkt. 29. However, even if those purported transcriptions are

32.  That argument distorts the district court's statement.  Earlier in the Decision, the district court acknowledged "that even a very short musical phrase containing some mix of musical elements **may be** entitled to protection if that mix is sufficiently original."  1-ER-19.  Here, the district court merely and correctly held, based on the undisputed record, that the specific **pitch sequence** of 3-3-3-3-2-2 is not protectable.

**Second**, Appellants mischaracterize this Court's decisions in *Swirsky* and *Three Boys* as holding that a combination in a composition of five unprotectable elements is *per se* protectable.  This Court held the opposite in *Skidmore*:

> Skidmore misconstrues *Swirsky's* observation that we have upheld "a jury finding of substantial similarity based on the combination of five otherwise unprotectable elements."  376 F.3d at 849 [citing *Three Boys*, 212 F.3d at 485].  There, the court was trying to fathom which aspects of a musical composition can be used for a similarity analysis, given that no definitive list of musical elements existed in the case law. **Properly read, *Swirksy* left open the possibility that five or more different musical elements may be analyzed for a substantial similarity analysis, not that a set of five musical elements is always sufficient to find infringement.**  *Id.*

952 F.3d at 1075 n.11.

---

considered by this Court—and they should not be—they do not contain the **3-3-3-3-2-2 pitch sequence which is actually at issue on this appeal.**  Accordingly, these purported transcriptions do nothing to refute Decker's admissions establishing that the 3-3-3-3-2-2 **pitch sequence** is not protectable.

**Third**, grasping at straws, Appellants also wrongly contend that the district court purportedly relied on an *amici* brief as "evidence" in applying the extrinsic test. OB at 51-53. As is evident from the Decision, the district court meticulously relied on the undisputed record in this case, and correctly applied the governing law that dictated the outcome of Appellants' claim. The citation of an *amici* brief in a footnote as a "see also" in no way alters the **trial record** which required judgment as a matter of law in Appellees' favor on the extrinsic test.

### 2. The District Court Correctly Held The JN Ostinato Does Not Contain A Protectable Combination Of Commonplace Elements

A protectable "combination" "cannot mean any 'set' of artistic building blocks." *Skidmore*, 952 F.3d at 1075. Again, it is "only the **new** combination, that is the '**novel** arrangement,' … and not '**any** combination of unprotectable elements ... [that] qualifies for copyright protection.'" *Id.* (emphasis in original). Notwithstanding Appellants' speculation that a large number of combinations of pitches are hypothetically possible (OB at 50), in music "only a few are pleasing; and much fewer still suit the infantile demands of the popular ear." *Darrell v. Joe Morris Music Co.*, 113 F.2d 80, 80 (2d Cir. 1940) (per curiam).

Thus, "[i]n assessing originality, courts must be 'mindful of the limited number of notes and chords available to composers and the resulting fact that common themes frequently appear in various compositions, especially in popular music.'" *Newton v. Diamond*, 204 F.Supp.2d 1244, 1253 (C.D. Cal. 2002);

39

*Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002) (acknowledging limited number of musical notes and combinations such that "it is not surprising that a simple composition of a short length might well be susceptible to original creations by more than one composer.").

Decker did not establish that an assemblage of the admittedly common elements in the JN Ostinato came anywhere close to constituting the "novel arrangement" required by *Skidmore*; to the contrary he failed to rebut prior art showing such "combination" was as unprotectable as the individual elements.[20]

The centerpiece of the claim is a pitch sequence of 3-3-3-3-2-2 (me-me-me-me-re-re) on evenly spaced notes. This is an elementary iteration of two adjoining white piano keys—as simplistic as music gets. As common sense dictates and Decker admitted, "that's relatively simple" to repeat a C note 4 times and a B note 2 times. 2-ER-295:14. This unremarkable pitch sequence is present in, *inter alia,* the age-old, public-domain compositions "Jolly Old St. Nicholas" and "Merrily We Roll Along." 2-ER-289-289:2-290:1. Decker admitted these two works

---

[20] Appellants' "selection and combination" argument also fails because their "expert[] never argued to the jury that the claimed musical elements cohere to form a holistic musical design." *Skidmore*, 952 F.3d at 1075. Appellants' "[l]abeling them a 'combination' of unprotectable elements does not convert the argument into a selection and arrangement case." *Id*. The undisputed facts of Ojukwu's creation of his simplistic beat from the internet, divorced from the rest of "Joyful Noise," underscores this point.

contain the same repeating descent from 3 to 2 on evenly spaced notes as "Joyful

Noise" and "Dark Horse" and even sang the identical sequences at trial. *Id.*[21]

Unavailingly, Appellants try to gloss over the significant, further

**unrebutted** prior art, in particular Gottwald's composition "Love Me Or Hate

Me," which predates Joyful Noise and supports independent creation. That work,

along with third party works "Brainchild" and "Choosing Life," also all contain the

same melodic repeating descent from 3 to 2 to 1 on evenly spaced notes. 2-ER-

137:8-20; 2-ER-139:12-24. As the illustration on page 3 reflects, the "melodic

shape" of a descent from 3 to 2 to 1 is a basic and elementary musical building

block. *See Skidmore*, 952 F.3d at 1058 (addressing basic building blocks of a scale

and "notes [which] are represented on the piano as a set of adjacent black and

white keys, from right to left").

> Based on the foregoing record, the district court correctly held:

> It is undisputed in this case, even viewing the evidence in the light most
> favorable to plaintiffs, that the signature elements of the 8-note ostinato
> in "Joyful Noise"- the 3-3-3-3-2-2 pitch sequence, the resolution of that
> sequence with a 3-2-1-5 sequence, the even rhythm without
> syncopation, and its development across a sparse texture-is not a
> particularly unique or rare combination, even in its deployment as an
> ostinato: prior compositions, including prior works composed by the

---

[21] Appellants' subsequent attempt to distinguish the works by examining eight notes, instead of six, actually made their case worse. When, at Appellants' counsel's request, Decker sang, "Jolly 3 3 3 3 2 2 2 1. Joyful 3 3 3 3 2 2 2 1", he only proved that *more* of the JN Ostinato pitch sequence exists in in the public domain. 2-ER-306:16-18.

parties, as well as what all agree is a separate non-infringing ostinato in "Dark Horse," all contain similar elements.

1-ER-20.[22]

> **3. The District Court Correctly Held, In The Alternative, That (a) The JN Ostinato Would Only Be Entitled To A Thin Copyright, And (b) The Ostinatos At Issue Are Not Virtually Identical**

> > **a. The District Court Correctly Applied The Thin Copyright Doctrine To The Works At Issue**

Under Ninth Circuit law, the JN Ostinato is not protectable, individually or as a combination of unprotectable elements. The district court simply corrected what the jury got egregiously wrong on the extrinsic test.

Even if, *arguendo*, the JN Ostinato were protectable as a "combination" of unprotectable elements under *Satava* and *Skidmore*, and it is not, the JN Ostinato would be entitled to a "thin" copyright, at most[23], which could only be infringed by "virtually identical" copying. That simply is not the case here.

Indeed, as this Court recently explained in *Skidmore*:

> Of course the degree of overlap in original expression that is required for the similarity to be substantial is determined by the range of possible

---

[22] Appellants' diversionary effort to point out certain musical elements in the prior art which are not present in "Joyful Noise" or "Dark Horse" is a red herring: "[t]hat these other [prior art] works may also contain other dissimilar elements does not alter the conclusion that the elements they share in combination comprise the 'bedrock' of what plaintiffs and their expert claim to be original." 1-ER-21.

[23] Under no circumstance should the JN Ostinato of eight notes, six of which are unequivocally the unprotectable sequence of 3-3-3-3-2-2 (four evenly spaced C notes and 2 evenly spaced B notes), be deemed to have anything more than the most narrow protection—*i.e.,* a thin copyright.

protectable expression. *See Apple Comput.*, 35 F.3d at 1443. More similarities are required to infringe if the range of protectable expression is narrow, because the similarities between the two works are likely to cover public domain or otherwise unprotectable elements. *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913-14 (9th Cir. 2010). Thus, **for works where there is a narrow range of available creative choices, the defendant's work would necessarily have to be "virtually identical" to the plaintiff's work in order to be substantially similar. We have at times described this result as the work having a "thin" copyright ….**

952 F.3d at 1076 n.13.

In the Decision, the district court properly recognized and applied that test:

"[A] selection and arrangement copyright is infringed only where the works share, in substantial amounts, the 'particular,' i.e. the 'same,' combination of unprotectable elements." *Led Zeppelin*, No. 16-56057, slip op. at 46. Here, because "the range of protectable expression" in an 8-note pop music ostinato comprised of individually unoriginal elements "is narrow"- *see Gaste*, 863 F .2d at 1068; 1 Nimmer on Copyright § 2.05 (2019)-the combination of unprotectable elements in defendants' allegedly-infringing ostinato "would necessarily have to be 'virtually identical'" to their counterparts in the plaintiffs' ostinato "in order to be substantially similar." *Led Zeppelin*, No. 16-56057, slip op. at 48 n. 13.

1-ER-22.

In reaching that correct conclusion, the district court relied on the undisputed trial record discussed above, which established that if any range of protectable expression exists in the JN Ostinato it is an unquestionably narrow one, at best. It is also undisputed that Ostinato 2 in "Dark Horse" contains important differences from the JN Ostinato—and thus is not "virtually identical." These

43

differences are readily discernable from the following **undisputed** transcriptions in the compositions' original keys:



1-SER-182.

It is Decker's admissions that again are dispositive. Decker admitted to each of the following significant differences between Ostinato 2 and the JN Ostinato:

- The pitch on Beat 7 of the JN Ostinato is a 2, while the pitch on Beat 7 of Ostinato 2 in "Dark Horse" is a 1. 2-ER-278:8-16.

- The pitch on Beat 8 of the JN Ostinato is a 1 or a 6, depending on the iteration. The pitch on Beat 8 of Ostinato 2 in "Dark Horse" is a 5. 2-ER-278:18-280:10.

- The 2 is repeated three times in the JN Ostinato but is only repeated twice in Ostinato 2 in "Dark Horse." Thus, Ostinato 2 descends to 1 a full beat before the JN Ostinato. 2-ER-278:8-16.

- The JN Ostinato takes 16 beats for all of the melodic content to be expressed before it repeats. In contrast, it only takes 8 beats for all the melodic content in Ostinato 2 in "Dark Horse" to be expressed. 2-ER-171:16-172:13.

44

- The JN Ostinato contains portamentos (also known as slides). 2-ER-284:9-22. There are no portamentos in "Dark Horse." That gives the JN Ostinato rhythmic and melodic content that is nowhere present in Ostinato 2 in "Dark Horse." *Id*.

- The JN Ostinato occurs throughout the entirety of "Joyful Noise"; Ostinato 2 in "Dark Horse" is only iterated during the verses. 2-ER-274:15-17.

- The ostinatos are in different keys (2-ER-239:5-25); the tempos are different (2-ER-241:1-6; 2-ER-283:23-25); the harmony is different (2-ER-283:11-18); and the harmonic rhythm is different (2-ER-283:19-22).

Because Appellants cannot refute these admissions, they cite Decker's self-serving testimony that these differences are purportedly unimportant.[24] This deflection does not alter the record of admissions as to many significant differences that establish the ostinatos are **not** virtually identical.

Based on Decker's admissions, the district court correctly concluded:

Taken together, these objective distinctions are substantial enough as to preclude a determination of virtual identity. *See Erickson*, 839 F. Supp. 2d at 1140. For this reason as well, even if the "Joyful Noise" ostinato were entitled to combination copyright protection in the

---

[24] For example, Decker admitted that the seventh and eighth pitches in "Joyful Noise" and "Dark Horse" were "[c]ertainly" "different," yet offered the meaningless comment that the ostinatos adopted the same "strategies" for the seventh and eighth pitches. 2-ER-238:1-22.

45

aggregate-and the Court concludes that it is not-the Court concludes that defendants would still be entitled to judgment as a matter of law.

1-ER-24.

### b. Appellants Cannot Challenge That The Thin Copyright Doctrine Applies To Musical Compositions

Appellants invent a **fictitious** legal rule that thin copyright protection does not apply to musical compositions. OB at 48. Not surprisingly, Appellants cite no authority for this erroneous proposition. *Skidmore* makes it clear that music is entitled to no lesser status than other copyrighted works when it comes to the protectable expression analysis, which includes the thin copyright doctrine. Logic, fairness, and common sense dictate that same result.

Although creative works such as plays, dolls, and musical compositions **in their entireties** may be entitled to broad copyright protection, when—as here—the allegedly infringed **portion** of such a work merely constitutes a combination of a small number of commonplace or clichéd elements, that is a narrow range of protectable expression, entitled to a thin copyright in that expression. For example, while paintings often may be entitled to broad copyright protection, "[i]f there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010). *Accord*, *Ets-Hokin v. Skyy Spirits, Inc.*, 323

46

F.3d 763, 766 (9th Cir. 2003) (thin copyright for photo of vodka bottle); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121-23 (2d Cir. 1930) (thin copyright for characters and events in a play); *Kaseberg v. Conaco, LLC*, 260 F.Supp.3d 1229, 1245 (S.D. Cal. 2017) (thin copyright for jokes).

Based upon this well-established precedent, the court in *Erickson v. Blake*, 839 F.Supp.2d 1132, 1139 (D. Or. 2012), correctly held that a **musical composition** based on the number pi was only entitled to thin copyright protection. *See also Morrill v. Stefani*, 338 F.Supp.3d 1051, 1061 (C.D. Cal. 2018) (combination of multiple unprotectable "basic musical devices" insufficient to survive defendants' summary judgment motion: "there is not such a great overlap to conclude both songs are substantially similar"). Based on the admissions of Decker, *supra*, the same analysis applies here. Appellants' effort to create a *per se* rule against thin copyright in music cases must be rejected.

## C.     Appellees Are Entitled To Judgment As A Matter of Law On The Intrinsic Test

If a plaintiff fails to satisfy the extrinsic test, the inquiry is over. The intrinsic test only allows infringement to be found as to substantial copying of **protectable** expression in the context of analyzing the works as a whole, including their differences. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). There is no dispute that the works here in their entirety are very different. Because of Appellants' admissions discussed above, no reasonable jury applying

47

the intrinsic test could find "the total concept and feel of 'Joyful Noise' and 'Dark Horse' are substantially similar in *original, protectable expression*." 3-ER-428.

## III. In the Alternative, The Court Should Affirm Based On Insufficient Evidence To Support The Jury's Finding Of Access

Proof of access requires "an opportunity to view or to copy plaintiff's work." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). "To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). Put differently, a reasonable opportunity "does not encompass any bare possibility in the sense that anything is possible." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482-84 (9th Cir. 2000). A reasonable opportunity requires more than mere speculation or conjecture. *Id.*

A plaintiff also bears the burden to bring forth "significant, affirmative and probative evidence" supporting his claim of access. *Gable v. Nat'l Broad. Co.*, 727 F.Supp.2d 815, 824 (C.D. Cal. 2010), *aff'd* 438 F.App'x 587 (9th Cir. 2011); *see also Bernal v. Paradigm Talent & Literary Agency*, 788 F.Supp.2d 1043, 1054 (C.D. Cal. 2010) (same); *Merrill v. Paramount Pictures Corp.*, 2005 WL 3955653 at *7 (C.D. Cal. Dec. 19, 2005) (same).

Access can be proven through direct evidence or, "[w]here there is no direct evidence of access, circumstantial evidence can be used to prove access either by

48

(1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *Loomis*, 836 F.3d at 995.

At trial, Appellants conceded they had no proof of direct access or chain of events linking "Joyful Noise" and the Dark Horse Writers. Appellants relied only on a theory of alleged widespread dissemination of "Joyful Noise," claiming the jury could reasonably infer that it was reasonably possible that either Walter or Gottwald had the opportunity to hear "Joyful Noise."

Appellants' evidence came nowhere near the proof required to establish "widespread dissemination" of "Joyful Noise." [25] Indeed, "the public dissemination necessary to infer that a defendant might have had access to the work is considerable." *McRae v. Smith*, 968 F.Supp. 559, 564 (D. Colo. 1997) (citing *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir.1984)). For a work to be widely disseminated, it must achieve a high degree of commercial success or be readily available in the relevant market. *E.g.*, *Art Attacks*, 581 F.3d at 1144 (no widespread dissemination of design where sales were 2,000 a year, at fair booths and store kiosks, and with postings on the Internet); *Rice v. Fox Broadcasting Co.*,

---

[25] This Court's recent comment related to the widespread dissemination standard in its *en banc* decision in *Skidmore* is discussed *infra*.

330 F.3d 1170, 1178 (9th Cir. 2003) (insufficient evidence of widespread dissemination where plaintiff sold 17,000 copies of video over 13 year period); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d Cir. 1983) (access found where song was number one on the popular music charts for weeks in the United States and England); *Jane Russell Designs, Inc. v. Mendelson & Assocs., Inc.*, 114 F.Supp.2d 856, 864 (D. Minn. 2000) (finding access where product was nationally sold, generated substantial revenue, and was nationally advertised to the public); *Jason v. Fonda*, 526 F.Supp. 774, 776 (C.D. Cal. 1981) (book sales between 200 and 700 copies in Southern California insufficient); *Buchanan v. Sony Music Entm't*, 2020 WL 2735592 at *6 (D.D.C. 2020) ("widespread dissemination . . . generally requires a significant showing of ubiquity . . . 'the mere fact that [Buchanan's] work was posted on the internet . . . is insufficient by itself to demonstrate wide dissemination'").

## A.     Appellants Mischaracterized The "Widespread Dissemination" Doctrine At Trial

At trial, Appellants falsely claimed that all they had to show was that "Joyful Noise" "**was out there** in the song universe, and it was available to professional songwriters who make a living listening to music" (6-SER-1202:1-4).  These are not, nor should they be, the tests by which a plaintiff proves widespread dissemination and they likely confused the jury.

50

First, Appellants' argument of being "out there in the song universe" improperly seeks to lower the access bar to a *de minimis* level of dissemination. It is antithetical to the actual widespread dissemination test that requires sound, factual evidence demonstrating a far and wide-reaching dissemination of a work to infer access. Appellants' baseless arguments likely confused the jury because, as discussed below, there was insufficient evidence of far and wide reaching dissemination of "Joyful Noise" sufficient to infer that "Mr. Gottwald and Mr. Walter had a reasonable opportunity to hear ['Joyful Noise'] . . . before they created 'Dark Horse's' instrumental" (6-SER-1202:7-9).

Second, Appellants' arguments that there was a special lower burden for plaintiffs who sued "professional songwriters who make a living listening to music" is both factually and legally unsound. Appellees do not make a living **listening** to music; they make a living **creating** music.[26] The widespread dissemination test looks at the Appellants' work, and where it is able to be viewed;

---

[26] Gottwald testified that, while "people think, oh, you just sit around and listen to music all day … in fact, that's the opposite." 5-SER-880:5-7; *see also* 5-SER-880:10-16. To the extent Gottwald did listen to music, he listened to music made by him and people he worked with. 5-SER-882:6-9. Walter concurred, testifying that some days he is "creating so much music that I don't feel like listening to any more music" and that when he did listen to music, he would "throw on some of my favorite music just to kind of relax or unwind." 5-SER-851:3-9. Both also testified that they did not listen to religious music, including Christian hip-hop. *Supra*, pp. 10-11, 13-14. This testimony was not contradicted or impeached.

51

not at Appellees' careers.  Under the actual legal standard of widespread dissemination, Appellants failed to prove access.

### B.    Appellants Failed To Prove "Joyful Noise" Was Widely Disseminated

#### 1.    Appellants' Evidence Of Distribution Of "Joyful Noise" In Traditional Media Was Insufficient

A plaintiff must prove by significant and probative evidence "a high degree of commercial success" of the allegedly infringed work or that it is "readily available in the relevant market" to establish widespread distribution.  *Loomis v. Cornish*, 2013 WL 6044349 at \*10 (C.D. Cal. Nov. 13, 2013), *aff'd* 836 F.3d 991 (9th Cir. 2016).  Appellants failed to satisfy this burden as a matter of law.

First, Appellants had no proof of any commercial success of "Joyful Noise." They had no evidence of any sales of "Joyful Noise," in any medium, not just traditional mediums such as "brick and mortar" stores.  *Supra*, pp. 11-12.  Second, "Joyful Noise" received no radio or television broadcast, save for the possibility of it playing **in the background** during Gray's interviews at unknown stations, at unknown times, and reaching an unknown audience.  *Supra*, p. 11.  There was no documentary evidence supporting this speculative testimony.

Second, there was no documentation proving "Joyful Noise" was performed at any concert, or at any specific venue, such as set lists, audiovisual recordings, or advertising. Appellants' sole evidence was testimony that "Joyful Noise" was

52

performed about 300 times—over several years—without identifying the venues or audience size, with 70 percent thereof being held at church and religious venues, and the balance largely occurring at religious themed events. *Supra*, pp. 11-12.

Appellants' evidence of some critical acclaim for their music, namely on Billboard charts in the Christian and Gospel music categories and via nominations for Christian or Gospel music awards, are not evidence of distribution of "Joyful Noise," nor do they remotely demonstrate that "Joyful Noise" was "readily available in the relevant market." *Loomis*, 2013 WL 6044349 at *10. This Court's decision in *Loomis* rejected evidence of similar critical acclaim, finding that it was irrelevant to the determination of widespread distribution. 836 F.3d at 994 (plaintiff's song had won several awards, but Court found that, "[d]espite these achievements, Bright Red Chords was not commercially successful").

### 2. The View Counts Of "Joyful Noise" On YouTube And Myspace Were *De Minimis*

"The availability of a copyrighted work on the Internet, in and of itself, is insufficient to show access through widespread dissemination." *Loomis*, 2013 WL 6044345, at *12; *Batts v. Adams*, 2011 WL 13217923, at *4 (C.D. Cal. Feb. 8, 2011) ("posting of videos and/or songs on YouTube, Amazon.com, and iTunes … is hardly 'widespread' [dissemination] and, in fact, is quite limited, and clearly insufficient to support a finding of access").

53

While this Court stated in *Skidmore* that "[g]iven the ubiquity of ways to access media online . . . access may be established by a trivial showing that the work is available on demand," 952 F.3d at 1068, that *dicta* did not overrule prior, consistent Ninth Circuit law concerning the need to prove a **reasonable** possibility of access.[27] Critically, the *en banc* Court appeared to voice concern about the negative impact on the copying test by a "dilution" of the test for access. *Id.* ("As a practical matter, the concept of 'access' is increasingly diluted in our digitally interconnected world.").

The doctrine of "widespread dissemination" must be conceptualized properly in the context of our new digital world. A plaintiff alleging "widespread dissemination" through the Internet should still be required to make a meaningful showing of access—otherwise, the two-part copying test (access plus substantial similarity), could collapse into an untenable, single-prong test.

A reasonable possibility of access was not demonstrated by Appellants at trial. Appellants relied solely on (1) six videos of "Joyful Noise" available on YouTube with a cumulative "view" count of **3.88** million views **between 2008 and 2012** and (2) the presence of "Joyful Noise" on the Myspace profile pages for Gray and Moore that had a cumulative "play" count of **2.49** million plays during those

---

[27] This statement was made by this Court in the context of overruling the "inverse ratio" rule. *Id.* at 1069.

same **five** years. 1-SER-169-71; 1-SER-173-74. Appellants' counsel kept repeating to the jury that these view counts proved the widespread dissemination of "Joyful Noise" because—*ipse dixit*—"6 million is a big number" (6-SER-1203:19). While his argument is not evidence, it undoubtedly created confusion and prejudice. Six million views is not remotely a "big number" in the context of the Internet; over a five-year period, it is *de minimis*.

While Appellants bore the burden to prove widespread dissemination of "Joyful Noise" via the Internet, they made no effort to put their evidence in context, and instead tried to ignore that context. Appellants were improperly able to bypass their burden of proving how significant their view counts and plays of "Joyful Noise" were **in the context of those platforms**. They were able to improperly shift the burden to Appellees, who submitted **unrebutted evidence** as to the insignificance of Appellants' views and plays on YouTube and Myspace.

Appellants' evidence was limited to the number of clicks on a link to "Joyful Noise" made over a five-year period by either a person or a programmed bot (as there was no way to differentiate). Appellants' documents did not show any more information, including whether the song was actually played after the link was clicked.

With respect to YouTube, the unrebutted testimony of Appellees' expert Bill Rosenblatt demonstrated that Appellants' **six** videos were among **billions** of other

55

videos available during the relevant time period, including **hundreds of millions** of music videos alone.  5-SER-959:24-961:10; 5-SER-962:11-21; 5-SER-963:8-24; 5-SER-964:12-966:3; 6-SER-1052:4-1053:14.  The unrebutted evidence demonstrated that Appellants' **3.88 million** YouTube views was **not** widespread dissemination but instead was *de minimis* compared to the massive number of **4.14 trillion** views of videos on YouTube during the same time period.  5-SER-963:8-966:3; 6-SER-1050:12-1051:7.  Moreover, Rosenblatt testified without rebuttal that to find a "Joyful Noise" video on YouTube, a user would have had to take affirmative steps to search for it by the song or artist's name; otherwise, trying to find it would be like trying to find six people in China without knowing their names. 6-SER-1056:14-1058:9.

The number of plays of "Joyful Noise" on Myspace was equally negligible. Appellees' expert Zachary St. Martin testified that the Myspace pages presented by Appellants were **two** out of **265 million** registered accounts, and that "Joyful Noise" was **one** song out of up to **53 million songs** from over **14 million** artists.  5-SER-995:12-996:11.  Next, he demonstrated that the **2.49 million** plays of "Joyful Noise" over four years were dwarfed by the **billion plays every month** that occurred during the same time period.  *Id*.  Like on YouTube, St. Martin also testified that the primary ways in which users could access a song on Myspace were by searching for a particular artist or song that the user already knew about,

56

and searching was not as advanced as it is now; "there was so much music on the site and the ability to find it was rudimentary." 5-SER-990:9-992:24; 5-SER-993:17-24; 5-SER-994:10-997:2. Finally, any songs that were "featured" on Myspace were mainstream songs in the rap, rock, and pop genres, not religious music or Christian hip-hop. *Id.* Even the "genre" pages on Myspace would have to be expanded to locate Christian categories within the alphabetical list of genres. *Id.*

Accordingly, no legally sufficient evidence existed for a reasonable jury to conclude that Appellants proved widespread dissemination of "Joyful Noise" on the internet based on their view/play counts[28] on YouTube and Myspace. These numbers cannot be considered widespread dissemination in the massive universe of online content.

In *Palmieri v. Estefan*, 35 U.S.P.Q.2d 1382 (S.D.N.Y. 1995), Gloria Estefan was found not to have had access to one work by the plaintiff in a record store she visited, which contained **15,000** musical works. Here, Appellants claim the Dark Horse Writers had access to one work by virtue of visiting an "online record store" containing **billions** of works.

---

[28] View counts are inherently unreliable, because there are repeat listeners and both YouTube and Myspace suffered from view/play artificial inflation through the use of bots and paid views/plays. 5-SER-962:22-963:7; 6-SER-1060:15-1062:13.

In addition to the scale of content, there is an undisputable further problem with equating Internet access with access to a particular work: a person has to enter specific search terms to find a work on the Internet—he or she cannot "browse" the aisles like one could in a brick-and-mortar store. Appellants proffered no evidence, and none exists, that Walter or Gottwald (or any other Dark Horse Writer) searched for "Joyful Noise," or visited the YouTube videos or Gray's or Moore's Myspace pages. All of the Dark Horse Writers testified that they had never heard of Gray, Moore, or their music before this lawsuit, and thus, did not know that the "Joyful Noise" videos were on YouTube or that Gray or Moore had Myspace pages, much less had a reason to search for and visit one of their Myspace pages. *Supra*, pp. 10-14. Walter and Gottwald also specifically testified that they did not search online for or listen to religious music, including Christian hip-hop. *Id*.[29]

This unrebutted evidence shows Appellants' claim of access to "Joyful Noise" is wholly speculative and without evidentiary support from which to infer the Dark Horse Writers had a reasonable opportunity to hear it. It is "the modern day equivalent of looking for a needle in a haystack—where the alleged seeker

---

[29] Even Gray testified that despite knowing of Ojukwu prior to purchasing the beat for "Joyful Noise," he only learned of the existence of the beat on Ojukwu's Myspace page because his friend brought it to his attention. 4-SER-690:12-691:15.

does not know the needle exists, and isn't looking for it." *Batts*, 2011 WL 13217923, at *4 (using this analogy to describe the "posting of videos and/or songs on YouTube, Amazon.com, and iTunes"); *see also Loomis*, 836 F.3d at 998 ("Although there was a bare possibility that they heard Bright Red Chords on the radio, or that they read about Loomis and the Lust in a magazine in the break room of Playback Studios, or that they picked up one of Loomis's promotional CDs while at Playback, that is not enough to raise a triable issue of access."); *Batiste v. Lewis*, 976 F.3d 493, 504 (5th Cir. 2020) (no access based on widespread dissemination theory where the defendants testified "that neither of them had heard of [plaintiff] or listened to his music before this lawsuit" and plaintiff "offered no evidence to dispute their testimony"); *Guzman v. Hacienda Records and Rec. Studio, Inc.*, 808 F.3d 1031, 1039 n.9 (5th Cir. 2015) ("Courts have rejected efforts by plaintiffs to establish access in the face of . . . sworn testimony [that the defendant has never heard of the plaintiff's work] unless there is probative evidence to the contrary.").[30]

---

[30] In this regard, *Loomis* confirms that it is also relevant that Appellants and Appellees operate in different musical universes, a distinction that both sides agreed upon. *Supra*, p. 9; *see also* 4-SER-670:13-671:22 (Gray, Lambert, and Moore all perform in the genre of Christian rap and, in that genre, they "cross paths and encounter each other on a regular basis" but had never met or communicated with any of the Dark Horse Writers).

59

**IV.**  **In The Alternative, The Court Should Affirm Based On Appellees' Unrebutted Evidence Of Independent Creation**

"Because independent creation is a complete defense to copyright infringement, a plaintiff must prove that a defendant copied the work." *Skidmore*, 952 F.3d at 1064. Accordingly, a *prima facie* claim of copying can be rebutted by showing that the alleged infringing work was independently created. *Three Boys Music*, 212 F.3d at 486 ("By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation.").

Here, Appellees presented irrefutable evidence of independent creation. Walter testified about his one-day creative process that led to the creation of the Instrumental Track, including both Ostinato 1 and Ostinato 2. *Supra*, pp. 7-8; 5-SER-829:10-835:17. Decker did not claim that Ostinato 1 in "Dark Horse," was infringing (*supra*, p. 35), did not rebut that it was created before Ostinato 2 by Walter, and conceded it has the exact same pitches (3-2-1-5) that are found in Ostinato 2. It is undisputed that Gottwald created a composition that contains the exact pitches 3-2-1-5 on evenly spaced notes in a sparse texture before Joyful Noise was created. These facts demonstrate both that the allegedly infringed music is commonplace and that Ostinato 2 was independently created.

60

In denying Appellees' motion on this issue, the district court relied on an out-of-context statement from *Reeves*, 530 U.S. at 150-51. While *Reeves* states that a court should consider "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses" (*id.* at 151), *Reeves* did not hold that testimony from interested witnesses may be ignored where a party fails to proffer **any** contradictory evidence. A plaintiff must do more than simply argue that the defendant is lying; the plaintiff has the burden to come forth with evidence proving the falsity of the defendant's evidence. *Id.* at 147 ("[I]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original).[31]

Appellees' burden is "one of production, not persuasion" and "involve[s] no credibility assessment." *Reeves*, 530 U.S. at 142. As Appellants did not present any evidence that Appellees' testimony of independent creation was false, their failure compels judgment as a matter of law on this issue.[32]

---

[31] The standard for judgment as a matter of law is the same as summary judgment. A defendant's own interested testimony of independent creation can support summary judgment. *See, e.g.*, *Calhoun*, 298 F.3d at 1233 ("The district court was correct in concluding that McGee's testimony constitutes uncontradicted evidence of independent creation, which fully negates any claim of infringement").

[32] Judgment as a matter of law is also warranted as to multiple Appellees because Appellants failed to present evidence that their activities violated any of Appellants' exclusive rights. 17 U.S.C. §§106, 501. Appellants solely provided

61

## V. In The Alternative, The Court Should Affirm To The Extent The Decision Calls For A New Trial On Liability And Damages

### A. The Jury's Liability Findings Were Against The Clear Weight Of The Evidence

The district court denied Appellees' motion for a new trial as moot based on its grant of judgment, but granted a new trial on liability and damages should that judgment be reversed. The arguments set forth above apply with even more force under the Rule 59 standard. On each liability element discussed above, incorporated herein by reference, the jury's findings were wholly contrary to the weight of the evidence. Moreover, each defense witness proved entirely credible, never once being impeached or contradicted with evidence. The district court properly determined in the alternative that the weight of the evidence required a new trial. *Experience Hendrix*, 762 F.3d at 841 (court may make "credibility determinations" on Rule 59 motion).

---

evidence that Kobalt and WC "provide[] music publishing administrative services" for certain Appellees (2-SER-390) and that KMI "furnished the production services of Walter and Gottwald" (*id.*), but presented no evidence about what that means or how such activities violate their exclusive rights. Appellants similarly failed to present evidence that Perry, Gottwald, Hudson, Houston or Sandberg violated any exclusive rights. (It is undisputed that Gottwald's contribution to the Instrumental Track related to elements that are not alleged to infringe "Joyful Noise.") Appellants contended these individuals were liable simply because of their co-ownership of the "Dark Horse" copyright; however, all co-owners are not automatically liable for direct infringement by the mere fact of their co-ownership. 6-SER-1156:8-1157:1; *Williams v. Gaye*, 895 F.3d 1106, 1130-32 (9th Cir. 2018) (co-owner who contributed non-infringing portion to infringing work not *per se* liable).

62

## B.       The Jury's Damages Award Was Excessive

The district court did not abuse its discretion by granting a new trial on damages in the alternative.  The district court recognized that "[t]he jury's damage award in this case … disregarded powerful testimony that it was Katy Perry's star power and Capitol Records' marketing efforts (not [Appellant's] ostinato) that generated 'Dark Horse's' commercial success" and was "clearly against the weight of the evidence presented at trial."  1-ER-31.  Thus, the percentage of each Appellees' profit that the jury awarded was excessive and lacking basis in fact.

To recover a percentage of Appellees' profits, Appellants had the burden to prove Appellees' gross revenue **attributable** to the infringement.  17 U.S.C. § 504(b).  The Ninth Circuit takes "the statute's general reference to 'gross revenue' to mean the gross revenue associated with the infringement, as opposed to the infringer's overall gross sales resulting from all streams of revenue."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 n.8 (9th Cir. 2004).  A "causal link between the infringement and the monetary remedy sought is a predicate to recovery of . . . profits."  *Id.* at 708.

If a causal link is established, the defendant has the initial burden to demonstrate that some or all of its profits were attributable to factors other than the infringement.  17 U.S.C. § 504(b); *Mackie v. Reiser*, 296 F.3d 909, 915 (9th Cir. 2002).  If the defendant meets its initial burden, then the burden shifts to the

63

plaintiff to show that "at least some portion of the revenue was actually generated by the infringement, rather than by other factors." *Dash v. Mayweather*, 731 F.3d 303, 331 (4th Cir. 2013).

Appellees offered uncontroverted testimony from two experts about the insignificance of Ostinato 2 to the commercial success and profits of "Dark Horse" and *Prism*. *Supra*, pp. 14-16. Appellees thus proved that other factors drove the success of "Dark Horse."[33] Ferrara testified that quantitatively, only 3.6% of the combined music and lyrics in "Dark Horse" are comprised of the notes in Ostinato 2 and that the qualitative value of Ostinato 2 is even less. King testified without contradiction that numerous other primary and secondary factors drove the success of "Dark Horse" and that Ostinato 2 was a relatively insignificant tertiary factor.

In contrast, Appellants' counsel ignored the simultaneous playing of other music, lyrics, and vocal performances, and simply argued that because Ostinato 2 appears in 45% of "Dark Horse," Appellants are entitled to 45% of Appellees' profits. The jury arbitrarily cut that incorrect percentage in half, erroneously finding without any evidentiary basis that 22.5% of the net profit earned by each

---

[33] While Appellees bore the initial burden to apportion, Appellees were not required to prove to a mathematical certainty the profits that are attributable to other factors—they needed only to provide a rational division. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408-09 (1940); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985); *Cream Records Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 829 (9th Cir. 1985).

Appellee from "Dark Horse" was "attributable to the use of the 'Joyful Noise'

musical composition in ostinato #2 in 'Dark Horse' as opposed to other factors."

3-ER-373. This was pure speculation unsupported by evidence.

Thus, the district court's conditional grant of a new damages trial should be

affirmed if this Court does not affirm judgment on liability in Appellees' favor.[34]

## VI. The Court Should Affirm The Denial Of Appellants' Motion For Prejudgment Interest

The district court properly denied as moot Appellants' motion for

prejudgment interest, but held that even if it had left the verdict in place, it "would

… decline plaintiffs' claim for prejudgment interest." 1-ER-32.

Prejudgment interest is unwarranted where, as here, the jury awards a

disgorgement of defendants' profits (as opposed to actual damages). *William*

*Hablinski Architecture v. Amir Construction, Inc.*, 2007 WL 9734429, at *4 (C.D.

Cal. Feb. 28, 2007). This is "because, unlike actual damages, the plaintiff never

---

[34] A new damages trial would also be appropriate because the jury failed to deduct Capitol's overhead in calculating its net profit. The Court instructed the jury to deduct "all appropriate expenses … including … overhead costs …." *Bouchat v. Baltimore Raven Football Club, Inc.*, 346 F.3d 514, 520-21 (4th Cir. 2001). Capitol proved its costs totaled $11,772,912, including $5,103,213 in overhead. 2-SER-260. Based on gross revenues of $12,402,637, Capitol proved its net profit totaled $629,725. *Id.* But the jury did not deduct Capitol's overhead in arriving at a net profit of $5,732,938. 3-ER-372. The jury appeared to have accepted Capitol's gross revenues of $12,402,637, but then only deducted $6,669,699 (*i.e.*, the non-overhead costs) to arrive at $5,732,938.

65

had those funds and so deserved no compensation for the lost use of the money while the case was pending." *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 51 (1st Cir. 2003). Rather, prejudgment interest "would constitute a windfall . . . ." *Lucky Break Wishbone Corp. v. Sears, Roebuck & Co.*, 2008 WL 11344630, at *1 (W.D. Wash. Dec. 24, 2008).

Nonetheless, Appellants requested interest to remedy purported undercompensation. 3-ER-360. To the contrary, the verdict contained an enormous windfall award of approximately $2.8 million, based on an improper disregard for Appellees' undisputed costs and apportionment evidence. *Supra*, pp. 63-65. A further windfall of interest was properly denied. *Brighton Collectibles*, 2009 WL 160235, at *5.

66

## **CONCLUSION**

The Decision should be affirmed.

DATED: March 29, 2021    MITCHELL SILBERBERG & KNUPP LLP

By: /s/ Christine Lepera
Christine Lepera
Jeffrey M. Movit
Jacob D. Albertson
J. Matthew Williams
Aaron M. Wais (SBN 250671)
Gabriella A. Nourafchan (SBN 301594)
Attorneys for Appellees Capitol Records, LLC,
Lukasz Gottwald, Sarah Theresa Hudson, Karl
Martin Sandberg, Henry Russell Walter, W
Chappell Music Corp. (f/k/a WB Music Corp.),
Kobalt Music Publishing America, Inc., and Kasz
Money, Inc.

DATED:  March 29, 2021    GREENBERG TRAURIG, LLP

By: /s/ Vincent H. Chieffo
Vincent H. Chieffo (SBN 49069)
Attorneys for Appellee Katheryn Elizabeth
Hudson p/k/a Katy Perry

67

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-55401

I am the attorney or self-represented party.

**This brief contains** | 15,389 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ◉ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Christine Lepera     **Date** | March 29, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**        68        *Rev. 12/01/2018*

## <u>STATEMENT OF RELATED CASES</u>

There are no related cases currently pending in this Court.

## CERTIFICATE OF SERVICE
*U.S. Court of Appeals Case No. 20-55401*

I hereby certify that I electronically filed the foregoing **APPELLEES'**

**BRIEF** with the Clerk of the Court of the United States Court of Appeals for the

Ninth Circuit by using the Appellate Electronic Filing system on March 29, 2021.

I further certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.

/s/ Christine Lepera
Christine Lepera

70